# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**BARRY C. COPE**
**KARL L. MULVANEY**
**KANDI KILKELLY HIDDE**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**DAVID L. HATCHETT**
**ERIC J. ESSLEY**
Hatchett & Hauck LLP
Indianapolis, Indiana



FILED

Oct 23 2012, 9:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| STATE AUTOMOBILE INSURANCE COMPANY, MERIDIAN SECURITY INSURANCE COMPANY, and INDIANA FARMERS MUTUAL INSURANCE COMPANY, | ) ) ) ) ) ) |
| Appellants-Defendants, | ) ) |
| vs. | ) No. 49A05-1109-PL-486 ) |
| DMY REALTY COMPANY, LLP and COMMERCE REALTY, LLC, | ) ) ) |
| Appellees-Plaintiffs. | ) ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-0902-PL-6337

**October 23, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

State Automobile Insurance Company and Meridian Security Insurance Company (collectively, "State Auto") appeal the trial court's order denying State Auto's motion for summary judgment and granting summary judgment in favor of DMY Realty Company, LLP and Commerce Realty, LLC (collectively, "DMY").[1] State Auto raises three issues which we revise and restate as:

I. Whether the language of certain pollution exclusions and endorsements contained in insurance policies issued by State Auto to DMY is ambiguous;

II. Whether there exists a genuine issue of material fact precluding the grant of summary judgment in favor of DMY; and

III. Whether the court erred in determining that State Auto should indemnify DMY for all of its past and future costs associated with DMY's claim.

We affirm and remand.

## FACTS

The facts as designated by the parties follow. The Chapelwood Shopping Center, owned by DMY during the relevant time period, consists of three separate buildings: the "Strip Mall" building, the "Noble Roman's" building, and the "Law Office" building (the three buildings collectively, the "Site"), and the buildings share a common parking lot. The Strip Mall consists of several retail spaces with addresses ranging from 7203 to 7231 W. 10th Street. Two former dry cleaners have operated in space within the Strip Mall including Chapel Hill Cleaners, located at 7225 W. 10th Street, which operated from

---

[1] We note that Indiana Farmers Mutual Insurance Company is also a named defendant/appellant in this case. However, at the outset of the summary judgment hearing held on August 11, 2011, counsel for Indiana Farmers Mutual Insurance Company notified the trial court that the dispute between them and DMY had been resolved, and the court in its order denying State Auto's motion for summary judgment and granting DMY's cross-motion for summary judgment noted that the defendants in the matter were "State Automobile Insurance Company and Meridian Security Insurance Company." Appellants' Appendix at 17.

1971 through 2001 and Norge Town Laundry and Dry Cleaning, located at 7223 W. 10th Street, which operated from 1971 through 1989.

Between May 1998 and May 27, 2004, State Auto issued a total of nineteen insurance policies to DMY pertaining to either the Strip Mall, the Noble Roman's, or the Law Office, each of which providing that State Auto would pay sums that DMY becomes legally obligated to pay as damages because of "property damage" to which the insurance applies if the damage occurred during the policy period. Each of the policies contained pollution exclusion language stating the following:

[This insurance does not apply to:]

f.      Pollution

(1)      "Bodily injury" or "property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a)      At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured . . . ;

* * *

(2)      Any loss, cost, or expense arising out of any:

(a)      Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)      Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

3

> chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Appellants' Brief at 12 (citing Appellants' Appendix at 466, 483, 499, 516, 540-541, 563-564, 587-588, 607-608, 641-642, 660-661, 670, 676-678, 692, 704-705, 714, 719-721, 735, 747-748, 757, 762-764, 778, 792-793, 804, 808-809, 823, 835-836, 847, 851-852, 866, 876, 892, 909, 930-931, 939, 955-956, 965).[2] Also, eighteen of the nineteen policies (except "the Second Noble Roman's Policy") contained an endorsement adding additional explanation for the pollution exclusion as follows: "The Pollution Exclusion applies whether or not the irritant or contaminant has any function in your business, operations, premises, site or location." Id. at 13 (citing Appellants' Appendix at 463, 480, 496, 513, 535, 559, 583, 619, 672, 696, 716, 739, 759, 782, 789, 827, 832, 869, 873, 889, 906, 927, 951).[3]

On May 6, 1991, a Phase I Environmental Site Assessment ("ESA") was completed by Arbor Environmental Services at the request of DMY in order to identify potential environmental concerns at the Site. The ESA noted that DMY indicated that the Strip Mall was constructed in the early 1970s and that Chapel Hill Cleaners was located at 7225 W. 10th Street. The ESA also noted that the presence of the Chapel Hill Cleaners did not constitute an environmental hazard but stated that "it is incumbent on the owners of the facility that they continue to follow applicable regulations concerning the handling

---

[2] State Auto notes in its brief that "while some policy forms separate the definition of 'Pollutants' from the language of the pollution exclusion, and some policy forms include additional language in the pollution exclusion, the relevant provisions in each policy's pollution exclusion are effectively identical." Appellants' Brief at 11.

[3] State Auto notes in its brief that "again, while some endorsements include some different language, the relevant portions of each endorsement's modification of the pollution exclusion are effectively identical." Appellants' Brief at 13.

4

of their" perchloroethylene, or PCE, which is a non-acutely hazardous waste under the U.S. Environmental Protection Agency's ("EPA's") Resource Conservation and Recovery Act ("RCRA") and is "a commonly used solvent in dry cleaning." Appellants' Appendix at 184-185.

On September 27, 2007, another Phase I ESA report was completed by Bureau Veritas for Peacock Companies, which was interested in purchasing the Site. The Bureau Veritas ESA similarly noted the existence of two former dry cleaners in the Strip Mall. The ESA also noted that "[t]he Chapel Hill Cleaners facility was listed in the regulatory databases as a RCRA small quantity generator" and specifically "generated spent halogenated solvent waste." Id. at 142. It also noted that "[t]he Norge Town facility was not listed in the regulatory databases and no other information was obtained regarding this former on-site operation." Id.

Bureau Veritas also completed a Limited Subsurface Investigation ("LSI") report dated September 28, 2007, which stated that PCE and TCE were detected in both the soil and groundwater at the Site. PCE was detected above industrial default closure levels in soil and TCE was detected above residential default closure levels in soil. The LSI recommended that additional subsurface investigation was warranted and specifically recommended that "'closure' be obtained through an IDEM program," via either entering the Voluntary Remediation Program ("VRP") or the Indiana State Cleanup program. Id. at 200.

On December 17, 2007, based on the LSI's recommendation for additional subsurface investigation, Bureau Veritas completed a Further Site Investigation Report

("FSI") for the site in which twelve soil borings were taken and six monitoring wells were installed. The FSI noted its results regarding the Chapel Hill Cleaners as follows:

> The results of site wide soil and groundwater analytical testing . . . indicated concentrations of VOCs above applicable IDEM RISC closure levels. Although several soil samples contained detectable concentrations of PCE and its degradation products, results of soil analytical testing for [certain soil borings] did not reveal concentrations above IDEM RISC Residential or Industrial Closure Levels. . . . Based on available data, soil exhibiting concentrations of chlorinated solvents exceeding IDEM closure objectives appears to be relatively defined and limited to the area of the parking lot immediately north of the 7225 tenant space and under the building. However, it should be noted that impacts to soil from the former dry cleaning operations underneath the building *have not been defined*.
>
> \* \* \* \* \*
>
> Based on available data, it is Bureau Veritas' opinion the source of the PCE is most likely located underneath the building and appears to be migrating to the north, possibly along a sewer line . . . and to the east, following groundwater.

Id. at 318-319. Additional subsurface investigation was recommended with respect to the former dry cleaning operations and specifically reiterated its recommendation that "'closure' be obtained through an IDEM program." Id. at 319.

On August 19, 2008, IDEM sent a letter to DMY requesting that DMY perform a Site Investigation to obtain information about the nature and extent of the environmental contamination at the Site. On November 6, 2008, IDEM sent a letter to Chris Abel of Alt & Witzig Engineering, as DMY's contact person, indicating that it had reviewed a VRP application and that the proposed cleanup was eligible for participation in the VRP. On December 23, 2008, DMY's counsel sent a letter to State Auto indicating that IDEM had accepted DMY's VRP application and that Alt & Witzig had been hired as the consultant to proceed with the investigation and remediation at the Site.

6

Alt & Witzig prepared a Phase II On-Site Investigation and Remediation Work Plan Report (the "Phase II Report"), dated January 2009, for DMY. Section 1.1.1 F of the Phase II Report, titled "Summary of Results of Phase II Investigations," indicated that "there are chlorinated solvent impacts in the soil and groundwater above the IDEM RISC RDCLs and IDCLs," that soil samples "indicated that concentrations of PCE, TCE and VC were above IDEM RISC RDCLs and IDCLs on the south central portion of the Site and extend underneath the building in the areas of the former dry cleaners," that "on-Site groundwater analysis indicated that concentrations of . . . PCE, TCE, and VC above IDEM RISC RDCLs and IDCLs throughout the central portion of the Site with the highest concentrations directly north and underneath the former dry cleaners in tenant units #7225 and #7223B," and that off-site "grab water samples" "were below reporting limits . . . ." Id. at 1006-1007. Also, some gasoline constituents were noted in the groundwater at the southwest corner of the Site.

CASE HISTORY

On February 10, 2009, DMY filed its complaint for declaratory judgment and damages against its insurers: State Auto and Indiana Farmers Mutual Insurance Company ("Indiana Farmers"). On December 10, 2010, State Auto filed its motion for summary judgment, brief in support, and designation of evidence. On February 23, 2011, DMY timely filed its cross-motion for summary judgment, its response to State Auto's motion for summary judgment and memorandum in support of its cross-motion, and its designation of evidence. DMY's memorandum in support of its cross-motion cited to a report prepared by John A. Mundell, P.E., L.P.G., an expert hired by DMY, for the proposition that "[c]onsistent with the available site data and with normal dry cleaning

7

operations during the relevant time frame, the contamination likely began sometime before 1997 and most likely between 1985 and 1995, with that contamination persisting in the subsurface throughout the period 1998 to 2004." Id. at 1622 (citing id. at 1961).

Also, on April 25, 2011, DMY filed a motion for summary judgment, memorandum in support, and designation of evidence against Indiana Farmers. On May 10, 2011, State Auto filed a motion to strike the expert report of John Mundell and its brief in support of the motion to strike, as well as its brief in response to DMY's cross-motion for summary judgment and reply in support of its motion for summary judgment and its supplemental designation of evidence. As part of its motion to strike, State Auto attached as Exhibit 1 a report prepared by its expert, Douglas B. Zabonick, P.E., who provided his opinion regarding Mundell's report that "[t]he available data do not support the conclusion that the most likely timeframe for the release to have occurred is between 1985 and 1995." Id. at 2411.

On May 31, 2011, DMY filed its response to State Auto's motion to strike and its reply in support of its cross-motion for summary judgment. Also on May 31, 2011, Indiana Farmers filed its motion to dismiss DMY's motion for summary judgment as request for advisory opinion and response in the alternative, in which Indiana Farmers stated that "[i]t is clear from DMY's Motion . . . that there is no current controversy between the parties. Indiana Farmers has accepted DMY's defense and indemnification without reservation." Id. at 2548. On June 10, 2011, State Auto filed its reply in support of its motion to strike.

On August 11, 2011, the court held a summary judgment hearing in which, at the outset, Indiana Farmers indicated that the summary judgment motion against it had been

resolved. The court heard arguments by State Auto and DMY on their motions for summary judgment and on State Auto's motion to strike. At the conclusion of the hearing, the court found Mundell's report reliable and admissible and denied State Auto's motion to strike the report. The court then asked the parties to tender proposed orders on the cross-motions for summary judgment. On September 1, 2011, the court entered its order denying State Auto's motion for summary judgment and granting DMY's cross-motion for summary judgment which found facts consistent with the foregoing and stated in part:

## I. FINDINGS OF FACT

\* \* \* \* \*

8. The evidence presented establishes that the chlorinated solvent contamination most likely occurred at the [Site] between 1985 and 1995, with that contamination persisting in the subsurface until addressed through remediation efforts beginning in 2009.

9 The evidence presented further establishes that DMY has incurred and will continue to incur expenses in performing environmental site investigation and cleanup mandated by the Environmental Claim and by applicable law, and that these costs and expenses, which were not challenged by State Auto, are reasonable and appropriate.

## II. CONCLUSIONS OF LAW

1. In its Motion for Partial Summary Judgment,[4] State [Auto] argued that DMY did not provide evidence of an "occurrence" during any of the State Auto policy periods, did not establish a duty to defend or indemnify under any of these policies, and did not provide adequate notice of the Environmental Claim. State Auto also asked this Court to Strike the Expert Report of John Mundell, and the Court denied this request at the hearing on August 11, 2011. DMY refutes each of these assertions, and in

---

[4] State Auto did not ask for summary judgment on the policy identified as SPP 9519578 01 for the time period May 1, 1999 to May 1, 2000. DMY has asked for summary judgment on this policy and all other State Auto policies.

turn has asked for summary judgment on each of the State Auto policies, and has also asked this Court to deny State Auto's Motion to Strike.

\* \* \* \* \*

4. Consistent with the Court's ruling from the bench after oral argument was held on August 11, 2011, the Expert Report of John Mundell is found to be admissible as evidence in this litigation, and particularly, as to the underlying issues of date of contaminant release, appropriateness of remedial approach chosen by DMY in responding to the Environmental Claim, and reasonableness of costs and expenses incurred and to be incurred by DMY in carrying out that remediation.

5. Because the Expert Report of John Mundell presents unrefuted evidence as to the date of the release of chlorinated solvents at the [Site] . . . State Auto owes DMY an obligation to defend and indemnify DMY relative to its losses in responding to the Environmental Claim under each and every one of the CGL policies State Auto issued to DMY.

6. The definition of "pollutants" contained in each of State Auto's absolute pollution exclusions is identical or substantially similar to the definition of "pollutants" in *Kiger. See American States v. Kiger*, 662 N.E.2d 945, 948 (Ind. 1996). *Kiger* and a number of other Indiana cases have all found this pollution exclusion to be ambiguous and unenforceable, and thus, ineffective at barring coverage. . . .

7. In the present case, and applying the binding precedent, this Court concludes that the absolute pollution exclusion is ambiguous and must be interpreted to afford coverage for the Environmental Claim.

8. Consequently, with respect to the State Auto policy SPP 9519578 01 for the time period of at least May 1, 1999 to May 1, 2000, the absolute pollution exclusion included in this policy is overbroad and ambiguous as a matter of law; it must be construed in favor of the insured; and will therefore not bar coverage as to DMY's losses relative to the Environmental Claim.

9. Based on the amount of damages sought to date by DMY, DMY's statements to the Court that the investigation and remediation is currently expected to total less than $1 million . . . SPP 9519578 01 is likely sufficient to cover DMY's damages. . . . However, the Court will also address the other CGL policies.

10. With respect to all of the other State Auto CGL policies issued for the time period May 1, 1998 to May 27, 2004, the Indiana-

specific modified pollution exclusion endorsement added to those policies does not cure the underlying ambiguity in the definition of "pollutants.". . .

* * * * *

### III.    JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by this Court as follows:

1.    State Auto's Motion for Partial Summary Judgment is denied;

2.    DMY's Motion for Summary Judgment is granted as to State Auto policy SPP 9519578 01 for the time period May 1, 1999 to May 1, 2000;

3.    DMY's Motion for Summary Judgment is separately granted as to the other State Auto policies with the Indiana-specific modified pollution exclusion;

4.    State Auto is hereby ordered to indemnify DMY for all of its past and future costs associated with addressing the Environmental Claim, and to pay all of DMY's past and future fees and costs associated with defending the Environmental Claim, with the precise amount of such indemnity and defense costs to be determined at a later date in this proceeding if the parties cannot themselves resolve the amount of costs to be paid; . . . .

Id. at 17, 19-23.

Before addressing the issues, we note that State Auto is appealing from the grant of DMY's motion for summary judgment and the denial of State Auto's motion for summary judgment.  Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001).  All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant.  Mangold, 756 N.E.2d at 973.  Our review of a summary judgment motion is limited to those materials designated to the trial court.  Id.

11

We must carefully review a decision on summary judgment to ensure that a party was not improperly denied his day in court. Id. A party moving for summary judgment bears the initial burden of showing no genuine issue of material fact and the appropriateness of judgment as a matter of law. Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 975 (Ind. 2005). If the movant fails to make this prima facie showing, then summary judgment is precluded regardless of whether the non-movant designates facts and evidence in response to the movant's motion. Id.

The fact that the parties make cross motions for summary judgment does not alter our standard of review. Hartford Acc. & Indem. Co. v. Dana Corp., 690 N.E.2d 285, 291 (Ind. Ct. App. 1997), trans. denied. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id. The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

ISSUES

I.

The first issue is whether the language of the pollution exclusions and endorsements contained in insurance policies issued by State Auto to DMY is ambiguous. In examining this issue, however, we note that the Indiana Supreme Court's recent pronouncements in State Auto. Mut. Ins. Co. v. Flexdar, Inc., 964 N.E.2d 845 (Ind.

12

2012), reh'g denied, are dispositive.[5]  Indeed, State Auto notes in its appellants' brief,

prepared in advance of the Court's decision in Flexdar, that it "will likely control the

issue of the application of the absolute pollution exclusions in State Auto's policy to

DMY's claim" and invited us to "decide this matter after the Supreme Court issues its

decision in the *Flexdar* matter."  Appellants' Brief at 29.  Similarly, State Auto also

recognized in its reply brief that Flexdar "will be relevant to both the single unmodified

absolute pollution exclusion as well as the modified absolute pollution exclusions that are

contained in each of the State Auto policies issued to DMY."  Appellants' Reply Brief at

1.  For its part, DMY argues in its brief that "State Auto reargued the same positions it

previously made" in Flexdar, that "[f]or the modified pollution exclusion policies, the

pending *Flexdar* case will likely decide whether those policies also contain ambiguous

language" (though DMY also notes, as recognized by the court in its order, that "just one

State Auto policy should be enough to cover all of DMY's losses") and that "[b]arring a

sweeping change in Indiana's environmental coverage precedent, State Auto must lose

this appeal."  Appellees' Brief at 2, 5 n.2, 6.

In Flexdar, Flexdar, Inc. ("Flexdar") manufactured rubber stamps and printing

plates between 1994 or 1995 and 2003, and its manufacturing process used the

chlorinated solvent TCE.  964 N.E.2d at 847.  Flexdar discovered the presence of TCE in

the soil and groundwater both on and off the site, IDEM informed Flexdar that it would

---

[5] We note that the Indiana Supreme Court's judgment in Flexdar was a plurality decision and thus did not reflect the reasoning of the majority of the Court; the opinion was written by Justice Rucker with Justice Dickson concurring and Justice David concurring in the result without opinion.  964 N.E.2d at 852.  Nevertheless, three justices agreed with the result reached, and the operative facts present in Flexdar, specifically the pollution exclusions and endorsements, are nearly identical to those in the instant case.  Accordingly, we find the reasoning expressed in Flexdar persuasive and controlling on the specific facts presented in this case.

13

be liable for cleanup costs, and Flexdar contacted State Auto (the same State Auto named in the instant case) requesting defense and indemnification, as Flexdar "maintained commercial general liability and umbrella insurance policies" through them. Id. The insurance policies in Flexdar contained pollution exclusion language which is identical to the language of the pollution exclusion recited in the facts above in DMY's insurance policies, and the Flexdar policies also contained the endorsement language which is similarly identical to the language in eighteen of the instant policies. Id. State Auto filed a declaratory judgment action "contending that coverage for the TCE contamination at issue was excluded pursuant to the pollution exclusion present in the policies," and both Flexdar and State Auto moved for summary judgment on the issue of coverage. Id. The trial court granted summary judgment in Flexdar's favor, this court affirmed on appeal, and the Indiana Supreme Court granted transfer and also affirmed the trial court. Id. at 848, 852.

The Court began its analysis by noting that "[t]he language of the pollution exclusion at issue in this case is no stranger to this Court" and that it has "interpreted this or similar language on no fewer than three occasions, reaching the same result each time." Id. at 848. The Court turned to Am. States Ins. Co. v. Kiger, 662 N.E.2d 945 (Ind. 1996), reh'g denied, noting that "State Auto characterizes Kiger as limited to its facts— that is, as applying only to a gas station's claim for a gasoline leak under a garage policy." Id. at 849. The Court disagreed with such a reading and noted that only two months later, in Seymour Mfg. Co. v. Commercial Union Ins. Co., 665 N.E.2d 891 (Ind. 1996), reh'g denied, a case involving a solid waste disposer, the Court recognized that "Kiger found the word 'pollutant' to be ambiguous" and "again construed this language

against the insurer and found a duty to defend." Id. (citing Seymour, 665 N.E.2d at 892). The Court also noted that State Auto's argument that the endorsement language "addresses the concerns . . . expressed in Kiger" was flawed because such a provision "takes effect only when the contaminant at issue has first been identified as a pollutant and the pollution exclusion has been determined to apply" and that "as discussed below the exclusion itself is ambiguous and unenforceable, and therefore the endorsement form does not come into play and is thus unavailing." Id. at 849 n.2 (citation and quotations omitted).

The Court next turned to Freidline v. Shelby Ins. Co., 774 N.E.2d 37 (Ind. 2002), in which "owners of a commercial building claimed coverage after toxic carpet glue fumes released during the installation of new carpet injured employees who worked in the building." Id. at 849 (citing Freidline, 774 N.E.2d at 39). On appeal, this court "found the exclusion ambiguous and construed it against the insurer so as not to exclude the claimed coverage" and the Indiana Supreme Court "unanimously 'agree[d] and summarily affirm[ed] the Court of Appeals on this point.'" Id. (quoting Freidline, 774 N.E.2d at 40). The Court also noted that in Magwerks, it again recognized its "previous declaration that under Indiana law, the definition of 'pollutants'" in pollution exclusions such as the one at issue as being ambiguous and also "observed that our courts have 'consistently construed the pollution exclusion against insurance companies.'" Id. at 850 (quoting Magwerks, 829 N.E.2d at 975).

The Court noted the policy's definition of "pollutants," defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and stated that as in Kiger, "this clause cannot be

15

read literally as it would negate virtually all coverage" because "practically every substance would qualify as a 'pollutant' under this definition, rendering the exclusion meaningless." Id. (quoting Kiger, 662 N.E.2d at 948). The Court noted State Auto's argument that Indiana "adopt what it describes as a 'common sense approach' and apply the pollution exclusion in situations where, as here, the release would "ordinarily be characterized as pollution." Id. The Court discussed what it described as "two main views when it comes to interpreting these exclusions, namely: a 'literal' approach and a 'situational' approach," identified the problems with each view, and noted:

> Indiana has gone in a different direction. Applying basic contract principles, our decisions have consistently held that the insurer can (and should) specify what falls within its pollution exclusion. In fact, State Auto has over the years promulgated an Indiana "business operations" endorsement, and an Indiana endorsement defining "pollutant." Where an insurer's failure to be more specific renders its policy ambiguous, we construe the policy in favor of coverage. Our cases avoid both the sometimes untenable results produced by the literal approach and the constant judicial substance-by-substance analysis necessitated by the situational approach. In Indiana, whether the TCE contamination in this case would ordinarily be characterized as pollution, is, in our view, beside the point. The question is whether the language in State Auto's policy is sufficiently unambiguous to identify TCE as a pollutant. We are compelled to conclude that it is not.

Id. at 850-851 (citations and quotation omitted).[6]

Here, as noted above the pollution exclusion and endorsement language is identical to the language in Flexdar. To that end, State Auto in its brief in the instant case again urges this court to adopt "a 'common sense approach' to interpreting a pollution exclusion," and directs us to Pipefitters Welfare Ed. Fund v. Westchester Fire Ins. Co.,

---

[6] The Court also noted that State Auto "has the ability to resolve any question of ambiguity" through more careful drafting and that it "in fact has done so. In 2005 State Auto revised its policies to add an 'Indiana Changes–Pollution Exclusion' endorsement" which "more specifically defined the term 'pollutants'" and which listed specific pollutants including TCE. Flexdar, 964 N.E.2d at 852.

16

976 F.2d 1037 (7th Cir. 1992), reh'g denied, a federal case applying Illinois and Missouri law which it also cited to in Flexdar. Appellants' Brief at 30. However, Flexdar is precisely on point on this issue, and consequently we conclude that the pollution exclusions and endorsements contained in DMY's insurance policies with State Auto are ambiguous. Thus State Auto may not deny DMY the coverage it seeks based upon such language.

## II.

The next issue is whether there exists a genuine issue of material fact precluding the grant of summary judgment in favor of DMY. To prevail on summary judgment, DMY bears the burden of proving that it is entitled to coverage under the insurance policies. PSI Energy, Inc. v. Home Ins. Co., 801 N.E.2d 705, 738 (Ind. Ct. App. 2004), trans. denied. Specifically, DMY must demonstrate that there is no genuine issue of material fact, thereby entitling it to judgment as a matter of law, that the property damage including soil and groundwater contamination occurred during the policy periods provided for in the insurance policies which, as noted above, was between May 1998 and May 27, 2004. See Appellants' Brief at 35 (noting that the policies contain language stating: "This insurance applies only if . . . 'property damage' occurs during the policy period") (citing Appellants' Appendix at 464, 481, 497, 514, 538, 560, 584, 606, 620, 640, 659, 674, 703, 717, 746, 760, 790, 806, 833, 849, 874, 889, 907, 928, 952).

As detailed below, State Auto spends the majority of its argument section on this issue providing reasons why the opinion of Mundell expressed in his expert report regarding the timing of the contamination "is simply guesswork and pure speculation, and therefore it should have been struck" and that in fact "there is no evidence that

17

contamination existed at the site until Bureau Veritas completed the Limited Subsurface Investigation in 2007." Appellants' Brief at 38. State Auto also notes near the end of its argument that even if admissible, the court erred in concluding that "the report 'presents unrefuted evidence as to the date of the release'" because "State Auto's expert's opinion unquestionably 'refuted' the basis for Mundell's opinion, and therefore there was, at the least, a question of fact as to whether Mundell's opinions should be given any weight . . . ." Id. at 42.

We note that all evidentiary rulings, including those with regard to admissibility of expert testimony, lie within the discretion of the trial court. Armstrong v. Cerestar USA, Inc., 775 N.E.2d 360, 365 (Ind. Ct. App. 2002), trans. denied. We may reverse such decisions only if a trial court abuses its discretion. Id. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual inferences and deductions drawn therefrom. Id. "The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the experts' testimony is based." Id. at 365-366 (citing Hannan v. Pest Control Servs., Inc., 734 N.E.2d 674, 679 (Ind. Ct. App. 2000) (citing McGrew v. State, 682 N.E.2d 1289, 1290 (Ind. 1997)), reh'g denied, trans. denied).

Indiana Evidence Rule 702 states:

(a)     If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

18

(b)     Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

"Indiana Evidence Rule 702 requires that an expert be qualified as such by his knowledge, skill, experience, training, or education." Armstrong, 775 N.E.2d at 366. "Additionally, an expert must have sufficient skill in the particular area of expert testimony before the expert can offer opinions in that area." Id. (internal quotations omitted). Therefore, before an expert may testify in an area, the proponent of the expert must show that the expert is competent in that area. Id. Also, "Indiana Evidence Rule 702 requires Indiana trial courts to act as gatekeepers of evidence, to ensure that expert testimony is relevant and rests upon a reliable foundation." Id. "Trial courts must preliminarily assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." Id. (internal quotation omitted). Scientific knowledge admitted by a trial court under Indiana Evidence Rule 702 must be "more than a subjective belief or unsupported speculation." Id.

While there is no absolute test for determining when testimony is reliable, some factors are: 1) whether the theory or technique can be or has been empirically tested; 2) whether the theory or technique has been subjected to peer review and/or publication; 3) whether there is a known or potential rate of error, as well as the existence and maintenance of standards controlling the theory or technique's operation; and 4) whether the theory or technique is generally accepted within the relevant scientific community. Id. (citing Wallace v. Meadow Acres Manufactured Hous., Inc., 730 N.E.2d 809, 813

19

(Ind. Ct. App. 2000), <u>trans.</u> <u>denied</u>; <u>McGrew</u>, 682 N.E.2d at 1292 n.5 (both cases citing <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579, 593-95, 113 S. Ct. 2786 (1993))).

In challenging Mundell's report, State Auto argues that Zabonick's expert report demonstrates that "the models utilized by Mundell are not the appropriate type of models to use for this site and the results are completely flawed and unreliable based upon the input data." Appellants' Brief at 39. State Auto notes regarding the first model Mundell uses, the Darcy seepage flow equation, that two values are critical to ensuring the accuracy with this model which are the average velocity and the total plume length. State Auto also argues regarding the average velocity that it is calculated by testing the hydraulic conductivity of the subject soils, but this was not done either by Mundell or by Alt & Witzig, and that instead "[a] single, estimated hydraulic conductivity value" was used which "will result in a high degree of uncertainty with respect to the accuracy of the results." <u>Id.</u> (citing Appellants' Appendix at 2413).[7] Regarding plume length, State Auto asserts that "[t]here is a significant discrepancy in the value of the plume length used by Mundell and the plume length used by Alt & Witzig" which "contributes to the inaccuracy of the final result of the Darcy model and ultimately, to the uncertainty of Mundell's opinion." <u>Id.</u> State Auto also points out that the near end of the range

---

[7] We note that this language is not contained on page 2413 of the appellants' appendix (Zabonick's report), and that indeed our review of the record does not reveal this quotation. To the extent that Zabonick in his report discusses hydraulic conductivity, the report states:

> The average velocity is calculated using the hydraulic conductivity of the Site soils. It should be noted that this analysis relies on the calculated/estimated hydraulic conductivity and plume length. Mundell discusses the sensitivity of the model to the variation of hydraulic conductivity in his report; however there is no discussion of the effect of variations in the plume length.

Appellants' Appendix at 2413.

calculated using the Darcy equation of when the release occurred "was 3.3 years prior to the November 2007 measurement of the plume length," and that "[w]hile Mundell attempts to conveniently dismiss that result as 'unrealistic,'" it "puts the potential date of the first release of chlorinated solvents at the Site after the May 2004 cancellation of the State Auto policies." Id. at 42-43.

State Auto next addresses Mundell's use of the BIOCHLOR modeling software, arguing that "[t]here are several issues with this modeling software" and "[u]ltimately, the results . . . fail to meet the scientific standard of reliability as required in Evid. R. 702 and cannot be relied upon by Mundell in his Expert Report." Id. at 39. First, State Auto argues that the BIOCHLOR was not designed for reverse modeling to determine the date of a release, which is how Mundell used the software. Second, State Auto argues that "in order for the BIOCHLOR software to be applicable, there must be 'constant source, hydrogeological, and biological property values for the entire model area' which simplifies actual site conditions," and that "[t]he conditions at this Site are not constant or uniform and therefore, an analytical model, such as BIOCHLOR, should not be used." Id. (quoting Appellants' Appendix at 2414). Third, State Auto argues that the software "is highly dependent on the variables entered into the software program" and that "[t]he values used by Mundell are not specifically tailored to the unique conditions at this Site but instead, are based on the suggested values from the BIOCHLOR user's manual, and therefore, are not scientifically reliable." Id. Fourth, State Auto argues that "a sensitivity analysis is necessary to evaluate the effect of the change in model inputs" and Mundell's report does not reflect that he performed such analysis. Id. State Auto notes that without a sensitivity analysis, "it is not possible to quantify the potential rate of error" and that

therefore "[t]here is no way to verify that Mundell's results are scientifically reliable . . . ." Id. at 41.

DMY argues that this court reviews the denial of State Auto's motion to strike Mundell's report for an abuse of discretion and State Auto's arguments fall short of demonstrating that the court abused its discretion. Appellees' Brief at 12. DMY argues that neither Mundell's opinion "nor the underlying processes Mundell used to derive his opinion are speculative," noting that "Mundell's opinion is replete with graphical representations of the analysis Mundell performed with specific inputs gleaned from available data." Id. at 13. DMY argues that State Auto's "assertion that 'there is no evidence that contamination existed until Bureau Veritas'" completed the LSI in 2007 is "preposterous" and "[s]ignificantly, this is not the opinion of State Auto's expert; rather, it is the unsupported assertion of State Auto's counsel." Id. at 13-14. DMY also asserts that "[m]oreover, it is undisputed that the dry cleaning operations at the [Site] that could have given rise to the contamination ceased in 2001" and "State Auto's posited 2007 release date hinges on the assumed presence of a chlorinated solvent source that had been removed six years prior." Id. at 14. DMY states that State Auto's expert "never disagrees with Mundell's release date, instead opining only that there is a 'potential' of different model outcomes if different inputs were used." Id.

Regarding Zabonick's criticism of Mundell's use of the BIOCHLOR model, "DMY submits that reliance on a model designed by the federal agency (U.S. EPA) charged with regulating contaminated sites to model chlorinated solvent plumes is perfectly appropriate – especially where State Auto's expert offers no alternative approach." Id. DMY argues that "the BIOCHLOR User's Manual states that

22

'BIOCHLOR is primarily designed for simulating the sequential reductive dechlorination of chlorinated ethanes and ethenes' like PCE and the other chlorinated constituents at issue here" and that it "can be used to 'predict the maximum extent of dissolved-phase plume migration' and to 'carry out many simulations.'" Id. at 15. DMY notes that, therefore, "the User Manual provides that the BIOCHLOR model can help determine how far a chlorinated solvent plume will travel and degrade over time given a known release date and location" and that "Mundell simply uses the BIOCHLOR model to solve for the release date, a different variable in the equation." Id.

Regarding State Auto's efforts to demonstrate that Mundell's opinion was not unrefuted, DMY notes that in Zabonick's report, "statements that there is a 'non-uniform [hydraulic] flow across the Site'" are conclusory and not independently supported by data because "he did not conduct any of his own sampling or talk with anyone who worked on the Property to discuss the saturated soil types actually found on the Property." Id. DMY also argues that "Zabonick does not opine on how the BIOCHLOR model's results would be affected by 'non-uniform' flow and did not assert that Mundell's results are in fact wrong because of the alleged non-uniform characteristics." Id. On the whole, DMY submits that "[s]imply put, Mundell's opinions lay out the available data, explain how those data were considered, and derive conclusions using a model and input criteria provided by the U.S. EPA or from site- specific conditions." Id. DMY argues that, by contrast, Zabonick in his report "stated that he does not like the model choice and thinks different inputs *may* have led to different results," but he "never claims that Mundell was wrong and never runs the model or any other analysis to determine whether Mundell's opinions were in fact affected one bit by the opposing expert's criticisms." Id. at 15-16.

23

DMY concludes that Mundell's opinion was "more than satisfactory to trigger coverage under each and every State Auto CGL policy issued to DMY" and State Auto failed to refute his opinion.[8] Id. at 16.

We first address the admissibility of Mundell's report, and we begin with a review of Mundell's qualifications. Mundell's report recites his expert qualifications in Section 6.0, noting that he "is a registered professional engineer and licensed professional geologist with over 31 years of diversified environmental and hydrogeologic consulting, geotechnical engineering and water resources evaluation experience." Appellants' Appendix at 1972. Mundell received a B.S. and M.S. in civil engineering from Purdue

---

[8] DMY also argues in its brief that "guarantees are not required in order for expert testimony to be admissible" and Mundell's opinion "that the dry cleaning contamination 'most likely' occurred between 1985 and 1995 and persisted in the soil and groundwater until remediation occurred" is "properly within the standard of admissibility" found in Indiana Law. Appellees' Brief at 13. DMY cites the following for this proposition:

> [N]o threshold level of certainty or conclusiveness is required in an expert's opinion as a prerequisite to its admissibility. Assuming the subject matter is one which is appropriate for expert testimony and that a proper foundation has been laid, the expert's opinion or conclusion that, in the context of the facts before the witness, a particular proposition is "possible," "could have been," "probable," or "reasonably certain" all serve to assist the finder of fact in intelligently resolving the material factual questions. *The degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is a matter for the jury to resolve*.

Strong v. State, 538 N.E.2d 924, 931 (Ind. 1989) (quoting Noblesville Casting Div. of TRW, Inc. v. Prince, 438 N.E.2d 722, 731 (Ind. 1982)) (emphasis added). State Auto in its reply brief latches onto this language, arguing that "[e]ven the authority cited by DMY supports State Auto's contention that, at the very least, there was a question of fact concerning whether any property damage occurred during State Auto's policy periods" and that "even if Mundell's speculation was admissible and properly considered . . . the opposing opinion of [Zabonick], which unquestionably 'refuted' the basis for Mundell's speculative opinion, required the trial court to weigh the value of Mundell's opinion, which is a matter for a jury to resolve." Appellants' Reply Brief at 9-10. State Auto argues that "[i]f a court must weigh conflicting evidence to reach a decision, summary judgment is improper." Id. at 10 (citing Madison Cnty. Bank & Trust Co. v. Kreeger, 514 N.E.2d 279, 281 (Ind. 1987), reh'g denied; Jackson v. Trancik, 953 N.E.2d 1087, 1094 (Ind. Ct. App. 2011)).

We note, however, that State Auto does not challenge the admissibility of Mundell's report based upon the fact that it asserts the contamination "most likely" began between 1985 and 1995. Rather, State Auto challenges the methodology and various numerical values utilized by Mundell in arriving at his conclusions as not scientifically reliable. Thus, DMY's citation to Strong is misplaced, and accordingly State Auto's arguments regarding Strong are equally unavailing.

24

University in 1979 and 1980, respectively, and for his M.S. degree he specialized in geotechnical engineering. He also pursued doctoral studies at the University of Notre Dame in civil engineering, specializing in groundwater/environmental engineering. While at Notre Dame, Mundell "was actively involved in research on analytical and numerical model development for the analysis of chemical movement through natural geologic porous media" which "was sponsored by the United States Environmental Protection Agency, the United States Department of Energy, and the American Society of Civil Engineers" and "focused on the derivation of fundamental equations for accurately describing the conceptual groundwater flow system, the incorporation of soil/chemical interactions and the resulting modifications to hydraulic conductivity, and the inclusion of inorganic multicomponent chemical releases into reactive porous media." Id.

In the early 1980s, Mundell worked as a staff and project engineer for a company named ATEC Associates, Inc. evaluating contaminated residential, commercial, and industrial sites. Mundell rejoined ATEC Associates in 1988 following his time at Notre Dame, which at the time was the 25th largest environmental consulting company in the United States, where he worked as the corporate director of technical and environmental consulting services, senior project manager, project director, technical consultant, and expert witness for the firm at project sites throughout North America and Puerto Rico. In 1995, Mundell left ATEC Associates and became president and senior environmental consultant for Mundell & Associates, Inc., "a firm he formed to specialize in the quantitative risk analysis of the movement of chemical releases into the environment, and their subsequent remediation," and, over the past fifteen years, "he has acted as principal-in-charge for multiple sites with . . . chlorinated solvent releases," among other things.

25

<u>Id.</u> at 1973. Mundell's firm has handled "some of the largest releases of petroleum hydrocarbons and chlorinated solvents in the State of Indiana" and "has been able to obtain some of the first closures using risk assessments for petroleum and chlorinated solvent release sites in Indiana." <u>Id.</u> Also, in 2001 Mundell & Associates "was recognized as the first company to gain approval of a site closure under the new IDEM Risk Integrated System of Cleanup (RISC) guidelines, a project that also received a national award for its innovative approach to site cleanup." <u>Id.</u> Section 6.0 of Mundell's expert report notes specifically that he "has expertise in the modeling of the movement of organic and inorganic chemicals in aquifer systems," that he has "developed and applied analytical and numerical models for chemical source release evaluation" and "completed time-of-travel and time-of-arrival predictive analysis," and that he has "published over fifty (50) papers involving environmental, hydrogeological, geophysical, geotechnical, and water resource consulting and engineering, with specific papers and presentations focused on . . . chlorinated solvent releases." <u>Id.</u>

To the extent that State Auto challenges Mundell's expert report's admissibility based upon the <u>Daubert</u> factors, we observe that the Indiana Supreme Court "has not established a specific test for the scientific admissibility of evidence pursuant to Indiana Evidence Rule 702(b)" and, although the <u>Daubert</u> factors can be helpful in that determination, the Court "has not mandated the application of <u>Daubert</u> and has chosen alternative approaches in the past." <u>Akey v. Parkview Hosp.</u>, 941 N.E.2d 540, 543 (Ind. Ct. App. 2011), <u>trans. denied</u>. In <u>Doe v. Shults-Lewis Child and Family Servs., Inc.</u>, 718 N.E.2d 738, 750 (Ind. 1999), the Court examined the admissibility of an expert opinion by affidavit in the context of summary judgment and held:

26

> [A]n expert opinion affidavit submitted in a summary judgment proceeding, in addition to asserting admissible facts upon which the opinion is based, must also state the reasoning or methodologies upon which it is based. The reliability of the scientific principles need not be established, but the trial court must be provided with enough information to proceed with a reasonable amount of confidence that the principles used to form the opinion are reliable.

Akey, 941 N.E.2d at 543 (quoting Shults-Lewis, 718 N.E.2d at 750-751).

Here, rather than an affidavit stating an expert opinion, the court was provided with a detailed expert report prepared by Mundell, who as discussed above is highly credentialed in the field of chemical releases and specifically chlorinated solvent releases. In Section 3.0 of his report, titled "Opinions and Basis of Opinions," Mundell states that "[b]ased on my review of available Site environmental investigation and remediation reports, regulatory files, site observations, historical site and area research, and my own education, experience and training," the PCE and TCE plumes "are more likely to have been developed from 'older' chemical releases (*i.e.,* those greater than 10 years in age from the point of observation in 2007)" and "[t]he most likely time frame is between 1985 and 1995. Once released into the subsurface, those chemicals persisted and continued to dissolved [sic] into subsurface groundwaters until source remediation activities were completed in July 2009." Id. at 1959. In rendering this opinion, the report attests that "[o]ur professional services have been performed, our findings obtained, and our recommendations prepared in accordance with customary principles and practices in the fields of environmental science, engineering and geophysical exploration." Id. at 1968.

Mundell's report discusses the bases for his opinion and notes that it "is supported by calculations using two methods of analysis, 1) the Darcy seepage velocity flow

equation and 2) a 3-D contaminant transport analytical solution calibrated to on-site plume concentration conditions," or the BIOCHLOR modeling software. Id. at 1959. The report notes that both methods use "the measured horizontal hydraulic gradient at the Site [], a reasonable estimated range of hydraulic conductivity [], an estimated porosity range [], and the size of the chlorinated solvent plume" as noted in the Alt & Witzig plume maps. Id. As stated in the report, the Darcy analysis yields "a time period of release from 1971 (the start of the operation of the dry cleaner) to an unrealistic date of 2004 . . . assuming the chemicals flow coincident with the groundwater . . . ." Id. at 1960. The report goes on to state that, in order to "determine the actual 'effective' hydraulic conductivity (and thus seepage velocity) . . . that ultimately controlled the spread of the chlorinated solvent plume," the analysis was done using the BIOCHLOR software which "allows for the transformation of a parent product, such as PCE, into daughter products" by using "the observed downgradient chemical concentrations in the PCE, TCE, cis-1, 2-DCE and vinyl chloride plumes to predict the most likely release periods that resulted in the observed conditions at the Site." Id. Mundell's report describes in detail the scientific basis of the BIOCHLOR software for simulating the releases and notes where the numerical values are derived from and cites to Table C1 of Appendix C for a list of the relevant values and their sources. At the conclusion of the relevant section, the report states that "[t]he results indicate the best fit to the data for releases in the range of 12 to 22 years before 2007 (i.e., 1985 to 1995)." Id. at 1961.

Thus, we find that Mundell's report contained a thorough explanation of the facts and methodologies used in forming the expert opinion. To the extent that State Auto raises various challenges to the admissibility of Mundell's report based upon statements

28

in its own expert report, including that Mundell's use of the BIOCHLOR software was inappropriate, that hydraulic conductivity at the Site was non-uniform which cuts against the reliability of the BIOCHLOR analysis, that for some of the variables in the equations Mundell used suggested values from the user's manual, and that Mundell's report does not reflect that he performed a sensitivity analysis, we note that, according to the applicable standard, DMY need not have conclusively established the reliability of Mundell's scientific principles in order to prove admissibility. We therefore conclude that Mundell's report provided the court with enough information to proceed with a reasonable amount of confidence that the principles used were reliable.

Having determined that the court did not err in denying State Auto's motion to strike, we must next evaluate State Auto's assertion that the 1985 to 1995 timeframe of the release was not "unrefuted," as the court concluded, by State Auto's designated evidence. Id. at 1959. We begin by noting that Section 1.2 of Mundell's report discusses the Site's background and notes that the 1991 ESA completed by Arbor Environmental Services "noted that the Chapel Hill Cleaners . . . was listed on the IDEM and U.S. EPA RCRA list as a medium volume generator of . . . . PCE . . . ." Id. at 1953. The report also notes that in March 2000 another ESA was completed for DMY and noted "[n]umerous PCE residue stains and spills were noted on the concrete floor of the cleaners" and "three (3) fifteen-gallon steel drums of PCE residue were observed to have been stored directly on the concrete floor of the store not within a secondary containment area." Id. The ESA "concluded that the dry cleaner was a recognized environmental condition (REC) due to its use of PCE as a dry cleaning solvent, its generation of PCE-containing wastes and the observed Site conditions." Id. Mundell's report also discusses the ESA performed by

Bureau Veritas, which noted that the Chapel Hill Cleaners operated from 1971 until 2001, that based upon the historic presence of the dry cleaner Bureau Veritas recommended and performed further subsurface investigation which ultimately led to the remediation of the site. Mundell's report proceeds to offer his scientific opinion, as discussed above, that the chlorinated solvent plumes in the soil were the result of older chemical releases and that the "most likely time frame is between 1985 and 1995." Id. at 1959.

To the extent that State Auto suggests that Zabonick's expert report refutes the evidence of the release date contained in Mundell's report, we note that Zabonick's report, although challenging the methodology used by Mundell in reaching his results, does not provide analysis to demonstrate an alternative release timeframe. Indeed, Zabonick's report limits itself to discussing the Darcy seepage flow analysis and BIOCHLOR analysis performed by Mundell and their limitations, and it identifies areas in which there are potential inaccuracies. However, State Auto and Zabonick's expert report fail entirely to account for the known history at the Site, including the fact that the dry cleaner closed in 2001, which was three years before State Auto's policies with DMY expired, and that the dry cleaner was known by IDEM and the U.S. EPA as a generator of PCE-containing waste, the same contaminant which required the remediation work.[9] To

---

[9] To the extent that State Auto argues that "Indiana cases have rejected the proposition that the mere presence of a dry cleaning operation at a site means that contamination exists at the site," and cites to Crawfordsville Square, LLC v. Monroe Guar. Ins. Co., 906 N.E.2d 934, 941 (Ind. Ct. App. 2009), trans. denied, Appellants' Brief at 35-36, we note that this court in Crawfordsville Square held that mere knowledge on the part of an insurer that a dry cleaner was operating on a parcel does not create a genuine issue of material fact that the insurer had "actual knowledge of actionable levels of dry cleaning-related contamination" in the context of the known loss doctrine which is "inapplicable if the insurer also knew of the circumstances on which it bases the defense." 906 N.E.2d at 941 (quotations omitted). Here, however, the issue concerns not whether an insurer had actual knowledge of dry cleaning-related

that end, the record is devoid of evidence or a scientific explanation for the presence of the plume at the Site which could place the beginning of its existence after May 2004. Accordingly, we conclude that the court did not err when it concluded that there was no issue of material fact precluding the granting of summary judgment in favor of DMY.[10]

III.

The final issue is whether the court erred in determining that State Auto should indemnify DMY for all of its past and future costs associated with DMY's claim. State Auto argues that "Indiana Farmers has unambiguously acknowledged coverage for DMY's claim, and because DMY has settled with Indiana Farmers, if the trial court's summary judgment rulings are affirmed, State Auto will be entitled to either a credit for the prior settlement or it will have contribution rights against Indiana Farmers" and that "[i]n either event, State Auto should not be required to pay 'all' of DMY's costs if the trial court's summary judgment rulings are affirmed." Appellants' Brief at 43. State Auto argues that "Indiana courts have long recognized that litigants are not entitled to a double recovery, including policyholders who seek insurance coverage from multiple

contamination, but rather concerns the timing of a chlorinated solvent release. To that end, the designated evidence contains the expert opinion of Mundell who found that, based upon a detailed analysis of available data, the release most likely occurred between 1985 and 1995, as well as other facts demonstrating that as far back as 1991 the dry cleaner at the Site was listed by IDEM and the EPA as a generator of PCE waste. We do not find Crawfordsville Square instructive.

[10] We note that we are not persuaded that State Auto's suggestion that the near end of the range calculated using the Darcy equation of when the release occurred, which "was 3.3 years prior to the November 2007 measurement of the plume length" and which equates to July 2004, or two months following the expiration of DMY's insurance policy relationship with State Auto, necessitates a conclusion that there exists an issue of *material* fact. First, Mundell in his report deemed the near end of this range to be "unrealistic." Appellants' Appendix at 1960. Also, as noted in Mundell's report the BIOCHLOR analysis was the more detailed plume analysis which Mundell relied upon in rendering his expert opinion that "[t]he results indicate a release period range beginning a few years after the start of operation and ending before 1997 (or at least 10 years before the monitoring wells were sampled)." Id. at 1961.

insurance companies," and that according to the court's order, as currently constructed, DMY would receive a double recovery or windfall.  Id. at 43-44.  State Auto argues that if this court upholds the trial court's summary judgment rulings, "State Auto will be entitled to a *pro tanto* credit for the sums that DMY has received or will receive in its prior settlement with Indiana Farmers."  Id. at 46.  State Auto argues that while "true that Indiana law provides that a defendant seeking a credit bears the burden of proving the amount of the credit . . . no Indiana case requires a litigant to bear that burden of proof without being allowed to develop and present relevant evidence to the trial court to meet its burden," and that "[i]f State Auto does not otherwise prevail on appeal, it should be entitled to argue the credit issue upon remand to the trial court."  Id. at 47-48.

State Auto also argues that if we uphold the grant of summary judgment to DMY, "State Auto will accrue a contribution claim against DMY's other insurer, Indiana Farmers, and therefore should not be summarily ordered to indemnify 'all' of DMY's costs when DMY has already received payment from Indiana Farmers."  Id. at 49.  State Auto argues that the Indiana Supreme Court has noted "that a party bringing a contribution claim must wait until after its obligation to pay is incurred, and therefore a contribution action does not accrue until the resolution of the underlying claim," and that accordingly "[i]f State Auto is not given a credit for the amounts DMY collects from Indiana Farmers, then the trial court should consider State Auto's contribution rights against Indiana Farmers before determining the amounts that DMY is entitled to collect from State Auto."  Appellants' Brief at 49.  Finally, State Auto argues that the Court has "also recognized the viability of contribution claims among insurers when it noted that 'the "other insurance" clauses typically found in these policies may have the effect of

prorating the damages among the insurers on the risk at different times in that period'" and that "[t]he question of how any damages should be prorated . . . needs to be considered if State Auto does not receive a credit for amounts collected by DMY pursuant to its settlement with Indiana Farmers." Id. at 50.

DMY argues that its settlement with Indiana Farmers was done pursuant to a loan-receipt agreement, which is an agreement "where one defendant wants to resolve its differences with plaintiff while another defendant refuses to do so," and "the settling defendant pays plaintiff a sum of money but gets back money if and when plaintiff is successful in its claim against the non-settling defendant." Appellees' Brief at 17. DMY notes that "[s]uch agreements do not provide for a double recovery and are specifically approved of in Indiana." Id. (citing Scott Cnty., Ind. v. Vaughn, 704 N.E.2d 1029, 1032 (Ind. Ct. App. 1998), reh'g denied, trans. denied). DMY notes that "[i]mportantly, *not one of the cases cited by State Auto addresses a loan-receipt agreement*" and that this "simple fact should end the analysis." Id. DMY argues that authority cited to by State Auto supports DMY's position, noting that in Sadler v. Auto-Owners Ins. Co., 904 N.E.2d 665, 670 (Ind. Ct. App. 2009), trans. denied, the court, "[w]hile cautioning against a windfall recovery to the plaintiff . . . noted that such concerns should be dealt with through a contribution action between the carriers, and not as a preemptive defense to payment by the non-settling insurer." Id. DMY argues that "[i]f it wishes to recover money from Indiana Farmers in a contribution action, State Auto can try to do so." Id.

DMY also argues that State Auto's "lengthy account as to why this Court should consider a *pro tanto* credit prior to enforcing the trial court's ruling" is "irrelevant because loan-receipt proceeds are specifically not subject to *pro tanto* credits against later

judgments." Id. at 18 (citing Duke's GMC, Inc. v. Erskine, 447 N.E.2d 1118, 1122 (Ind. Ct. App. 1983); Manns v. State Dep't of Highways, 541 N.E.2d 929, 933 (Ind. 1989), (citing Am. Transp. Co. v. Central I.R. Co., 255 Ind. 319, 322-323, 264 N.E.2d 64, 67 (1970)), *superseded by statute on other grounds*). Finally, DMY argues that State Auto's suggestion that it "must be allowed to pursue a contribution action against Indiana Farmers *before* it is forced to pay DMY" is "premature at best" considering it has not yet brought such a claim and, further, State Auto does not cite to authority for such a "timing sequence." Id. DMY argues that, "[t]o the contrary, case law states that a contribution action only ripens *after* paying the underlying claim." Id. (citing Essex Grp., Inc. v. Nill, 594 N.E.2d 503, 507 (Ind. Ct. App. 1992) ("The obligation to indemnify does not arise until the party seeking indemnity suffers loss or incurs damages. This may occur when the party seeking indemnity 1) pays the underlying claim; 2) pays judgment on the underlying claim; or 3) tenders payment in settlement of the underlying claim."); Estate of Leinbach v. Leinbach, 486 N.E.2d 2, 5 (Ind. Ct. App. 1985) ("[T]o be entitled to contribution, the [claimant] must have first paid the debt . . . .")).

State Auto in its reply brief notes that both it and the court were informed of the settlement between DMY and Indiana Farmers at the summary judgment hearing and that thus it "did not have an opportunity to address any credit or contribution issues arising from the eleventh hour settlement during the briefing of the summary judgment motions." Appellants' Reply Brief at 12. State Auto also notes that the trial court "adopted verbatim the 'Judgment' portion of DMY's proposed order," and this court has stated that the practice of "wholesale adoption of an order drafted by counsel . . . weakens the confidence of other courts that the findings are the result of considered judgment by the

trial court." Id. Finally, State Auto notes that it was able to raise this issue only "after the entry of the trial court's summary judgment order in response to DMY's Motion to Enforce and Compel Payment of Costs" which the court denied and stayed further proceedings pending this appeal, and it argues that "[t]he trial court should have the first opportunity to address the credit and contribution issues that arise from the language of its order . . . ." Id. at 13.

Initially, as a general matter we observe that an insurer may seek contribution from another insurer to recover a *pro rata* share of expenses in an environmental remediation cleanup by filing a complaint. See Ind. Farm Bureau Ins. Co. v. Harleysville Ins. Co., 965 N.E.2d 62, 66 (Ind. Ct. App. 2012); see also Ind. Ins. Co. v. Granite State Ins. Co, 689 F. Supp. 1549, 1558 (S. D. Ind. 1988) ("Under Indiana law, it is well-settled that before there is a right of contribution between insurance companies providing concurrent coverage, the policies must cover (1) the same parties, (2) in the same interest, (3) in the same property, (4) against the same casualty."). Also, "parties bringing contribution and indemnification claims must wait until after the obligation to pay is incurred, for otherwise the claim would lack the essential damage element." Pflanz v. Foster, 888 N.E.2d 756, 759 (Ind. 2008) (citing Comm'r, Ind. Dep't of Envtl. Mgmt. v. Bourbon Mini-Mart, Inc., 741 N.E.2d 361, 372 n.9 (Ind. Ct. App. 2000) (providing that "an obligation to indemnify or for contribution does not arise until the party seeking such remedy suffers loss of damages, i.e., at the time of payment of the underlying claim"), aff'd in relevant part, 783 N.E.2d 253, 256-257 (Ind. 2003); TLB Plastics Corp., Inc. v. Procter & Gamble Paper Products Co., 542 N.E.2d 1373, 1376 (Ind. Ct. App. 1989) (stating that an obligation to indemnify arises only after one seeking indemnity suffers

loss or damages even if indemnity and injured party's claim are litigated contemporaneously), reh'g denied; Leinbach, 486 N.E.2d at 5 (providing that "to be entitled to contribution, the [claimant] must have first paid the debt"); McLochlin v. Miller, 139 Ind. App. 443, 448, 217 N.E.2d 50, 53 (Ind. Ct. App. 1966) (providing that "payment must be made under compulsion to entitle payor to contribution")).

In the instant case, the balance of DMY's arguments on this issue are predicated on the fact that its settlement agreement with Indiana Farmers was done pursuant to a loan-receipt agreement. The Indiana Supreme Court has stated:

> "[A] loan receipt is an instrumentality which permits the insurer to pay an insured speedily and yet press in court to recoup its losses from the wrongdoer without the insurer appearing by name, thereby avoiding some of the consequences of subrogation.'" [Klukas v. Yount, ]121 Ind. App. 160, 98 N.E.2d 227, 229 (Ind. Ct. App. 1951).

> Loan receipt agreements or "partial settlement agreements," as they are sometimes referred to, were described by Judge Robertson in Burkett v. Crulo Trucking Co, Inc. as follows:

> > A loan receipt agreement, in its simplest form, provides that one with potential liability to a claimant will advance funds in the form of a non-interest loan to the claimant in order that the claim may be prosecuted against another who is also potentially liable for the claim. In return for the funds advanced, the claimant agrees that he will not sue or will not seek to enforce a judgment against the lender and will repay the loan according to some formula based upon the claimant's recovery against the other party. Such an agreement, then, serves to limit the liability of one against whom a claim might be pressed and, at the same time, gives the claimant an immediate 'bird in hand' instead of forcing him to await but possible recovery following protracted litigation.

> 171 Ind. App. 166, 355 N.E.2d 253, 258 (Ind. Ct. App. 1976). The judicial policy of this State strongly favors the use of partial settlement agreements. Manns v. State, Dept. of Highways, 541 N.E.2d 929, 932 (Ind. 1989).

Vaughn, 704 N.E.2d at 1031-1032.

36

Also, payments made pursuant to a loan-receipt agreement "may not constitute a partial payment or satisfaction of a judgment" and, as such, there are no double recovery concerns regarding such payments. Duke's GMC, 447 N.E.2d at 1122. This court addressed this issue in Barker v. Cole, 396 N.E.2d 964 (Ind. Ct. App. 1979). In Barker, Barker was driving his Ford Torino when he was rear-ended by a semi-tractor trailer being operated by Watkins, an employee of B & B Industries. 396 N.E.2d at 966. Barker's Torino, as a result of the collision, crossed the median and struck a van being driven by Cole. Id. Cole sued Watkins, B & B Industries, Barker, and another party for injuries suffered and Cole was awarded $50,000 damages. Id. at 966-967. "After judgment was entered, B & B Industries, Watkins, Aetna Life and Casualty Co. (their insuror) and Cole entered into an agreement entitled 'Loan Receipt Agreement and Covenant not to Execute" which we explained as follows:

> In order to provide Cole with funds needed to support himself and his family during the pendency of the appeal and to limit the liability of the signing tortfeasor, the agreement was entered into. Under the agreement Cole received a loan, without interest, of $25,000. He agreed to not execute judgment or seek further payment from the signing tortfeasors and to pursue Barker for the full amount of the judgment. To the extent that recovery from Barker exceeded $25,000, Cole agreed to repay the loan. If Cole was unable to recover more than $25,000 or if the appeal was successful and he chose not to retry the case, no repayment of the loan was required. The agreement stated that the parties understood the law of Loan Agreements and expressed the intention that this agreement come within the purview of that law.

Id. at 970-971.

On appeal, Barker argued "that the agreement is merely a covenant not to execute and that he is entitled to a pro tanto credit on the judgment of the amount received under the agreement." Id. at 971. We held that the agreement was a loan receipt agreement and

37

"did not constitute a partial payment or satisfaction of the judgment." Id. Accordingly, Barker was "not entitled to a pro tanto credit of $25,000 on the judgment" and Cole was "entitled to proceed against [Barker] for the full amount of said judgment." Id.

Here, however, despite DMY's arguments, there are no citations to the record demonstrating that indeed it settled with Indiana Farmers pursuant to a loan-receipt agreement. DMY in its brief notes that "[t]he Confidential Settlement Agreement between DMY and [Indiana Farmers] was submitted to the trial court under seal" and that "[i]f this Court so requests or advises, the parties will provide the Agreement to this tribunal as well." Appellees' Brief at 17 n.4. DMY also argues, without citation to the record, that "the terms of the Agreement are not a secret to State Auto" and "[n]otwithstanding its attempts to scare this Court into believing otherwise, State Auto knows that under the loan-receipt Agreement, DMY is not going to obtain a double recovery." Id.

We also find notable that State Auto in its reply brief does not reject DMY's contention regarding the nature of the settlement, lending credence, albeit implicitly, to the notion that DMY and Indiana Farmers did in fact settle pursuant to a loan receipt agreement. Accordingly and under the circumstances, we conclude that remand is warranted for the trial court to review any settlement agreement between DMY and Indiana Farmers and consider any valid contribution or credit issues.

For the foregoing reasons, we affirm the court's order granting summary judgment in favor of DMY and denying summary judgment in favor of State Auto, and we remand for the court to address any valid contribution or credit issue consistent with this opinion.

Affirmed and remanded.

BAKER, J., and KIRSCH, J., concur.