**MERIDIAN MUTUAL INSURANCE CO.,**
**Appellant (Defendant below),**

v.

**AUTO–OWNERS INSURANCE**
**COMPANY, Appellee**
**(Plaintiff below).**

**and**

**Benjamin C. Markham, Individually and as administrator of the Estate of Sheila A. Markham, et.al., Appellee/Defendants.**

No. 14S01–9605–CV–374.

Supreme Court of Indiana.

Aug. 31, 1998.

Stephen J. Peters, Richard P. Winegardner, Indianapolis, Gerald Allega, Evansville, for Appellant.

Vincent S. Taylor, Bloomington, for Appellees.

## ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

The insurance policy in this case covers carpools but not driving for hire. We have accepted jurisdiction to explore the difference.

This case arose from an automobile accident between a car driven by Sheila Markham and a van owned by Gail Riggins but driven on the day of the accident by Larry Ramsey. The collision killed Markham and Ramsey and injured the eight other passengers in the van, some severely. Auto–Owners Insurance Company, as primary insurer of Riggins' van, initiated this interpleader and declaratory judgment action against Ramsey's insurer, Meridian Mutual Insurance Co., and others, to resolve conflicting claims against its limited liability.

Meridian's policy provided coverage for liability arising out of Ramsey's permitted use of another's automobile, but excluded from coverage "[b]odily injury or property damage arising out of the ... use of a vehicle when used to carry persons or property for a fee." (R. at 47 (emphasis excluded).) The exclusionary clause further stated, "This exclusion does not apply to ... [s]hared-expense car pools...." (*Id.*) The policy does not define "shared-expense car pool" or what it means to "carry persons or passengers for a fee." Meridian's potential coverage is secondary to the coverage afforded by Riggins' Auto–Owners policy; therefore, Meridian defends against excess liability claims arising from the accident. *See* Ind.Code Ann. § 27–8–9–7 (West Supp. 1997).

Meridian denied liability and filed a cross-claim against the named defendants, averring that Ramsey was driving the van to carry persons for a fee. Defendants Yoder, Chestnut, Markham, and Craig filed a cross-claim seeking a declaratory judgment against Meridian, asserting that this incident fell within the "shared-expense car pool" exception.

On cross-motions for summary judgment, the trial court held against Meridian. A divided panel of the Court of Appeals reversed. *Meridian Mutual Ins. v. Auto–Owners Ins.*, 659 N.E.2d 207 (Ind.Ct.App. 1995). We grant transfer and affirm the decision of the trial court.

## I. Facts

Gail Riggins, Larry Ramsey, and the other participants in the commuting arrangement all lived in or near Odon, Indiana, and worked for Thomson Consumer Electronics in Bloomington. Each workday morning Riggins met her co-workers at the Odon Christian Church and they commuted together to Bloomington in her large van. Each passenger gave Riggins $17.00 per week for the eighty-four mile daily round-trip. On days when Riggins was working a different shift or not going into work, she let the other commuters use her van, allowing an alternate driver (normally, Larry Ramsey) to deduct $5.00 from that week's $17.00 contribution for each day he drove in her place.

Riggins had been involved in such an arrangement for many years. She had originally been a passenger, paying the previous owner/driver of the van $15.00 per week "for his expenses and things." (R. at 202.) In 1973 that driver sold Riggins the van and moved to Bloomington. Riggins and the other commuters continued the $15.00 per week arrangement until 1989, when Riggins' purchase of a new van and an increase in gasoline prices prompted an increase to $17.00. Riggins says she used the money for "[g]asoline and tires, and the upkeep of the van, and insurance." (R. at 203.) Although she did not keep any records to determine whether she received enough to cover her expenses, (*id.*), she did believe that the amount she received was completely spent on expenses related to the commute. She saw no need to report any of the receipts as income on her taxes, take business expense deductions, or even discuss the matter with her accountant. She stated that the group approached the payments as a sharing of the expenses of the trip, and that she was not involved in the arrangement as a business or for profit.

Although there were some changes in riders over the fifteen-year period, most of the commuters had been riding with Riggins under this arrangement for many years with little fluctuation in participation. When she began the driving the van, only five or six riders commuted with her.

Riggins knew she would be working a late shift on February 18, 1992, so she made arrangements with Ramsey to drive the van. While returning from Bloomington that afternoon the van collided with Sheila Markham's car, killing Ramsey and Markham and injuring the van's other eight passengers.[1]

## II. Summary Judgment

■ Reviewing a trial court's entry of summary judgment, we examine the same issue as the trial court does, upholding the grant only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Havens v. Ritchey*, 582 N.E.2d 792 (Ind.1991); *see also* Ind.Trial Rule 56(C). While cross motions for summary judgment on the same issues do not, in and of themselves, prove the absence of a genuine issue of material fact, *Whitcomb v. Young*, 258 Ind. 127, 279 N.E.2d 566 (1972), where both parties in their cross-motions assert that a policy term is unambiguous, "construction of a contract under such a situation is a judicial function." *B & R Farm Serv., Inc. v. Farm Bureau Mutual Ins. Co.*, 483 N.E.2d 1076, 1077 (Ind.1985).

## III. Principles of Insurance Policy Interpretation

■ Ambiguous provisions in insurance policies are construed in favor of the insured. *American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind.1996). This is particularly true with unclear provisions that limit or exclude coverage. *Id.* Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. *Masonic Accident Ins. Co. v. Jackson*, 200 Ind. 472, 164 N.E. 628 (1929). "This strict construal against the insurer is driven by the fact that

the insurer drafts the policy and foists its terms upon the customer. 'The insurance companies write the policies; we buy their forms or we do not buy insurance.'" *American States Ins. Co.*, 662 N.E.2d at 947 (quoting *American Economy Ins. Co. v. Liggett*, 426 N.E.2d 136, 142 (Ind.Ct.App.1981)).

■ When insurance policy language is clear and unambiguous, however, it should be given its plain and ordinary meaning. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). Under Indiana law, an insurance policy is unambiguous if reasonable persons cannot honestly differ as to the meaning of the policy language. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990, 991 (1987). One way of determining whether reasonable persons might differ is to see if the policy language is susceptible to more than one interpretation. *Id.*

We conclude that the ordinary meaning of the exclusionary clause at issue here is such that the trial court was correct to hold that the driving arrangements in this case constituted a "shared-expense car pool."

## IV. "Shared-expense Car Pool"

■ The Court of Appeals determined that a "shared-expense car pool" is an arrangement where the expenses are "shared on a ratable basis." *Meridian Mutual Ins.*, 659 N.E.2d at 213. The court further elaborated:

For the "shared expense" car pool exception to serve its purpose within the policy, the passengers must not merely contribute but must contribute in proportion to the expenses actually incurred. Absent a proportionate allocation of expenses among the passengers, the owner is merely carrying passengers for a fee. Here, there is no evidence of expenses and, hence, no correlation between expenses and the amount paid by the passengers. There is no factual basis in the record to support a conclusion that the expenses were actually shared. The most that can

---

1. While eleven commuters normally rode with Riggins, only nine of them were in the van that day.

be said is that the fee collected was simply used to defray the expenses of operating the van. That is not enough to invoke the exception.

*Id.* at 213. Determining that Riggins' arrangement was not a "shared-expense car pool," the Court of Appeals found that Meridian's "carrying for a fee" exclusion applied to deny coverage for injuries and damage arising out of this accident.

The Seventh Circuit recently addressed this exact issue in *General Accident Ins. Co. v. Gonzales,* 86 F.3d 673 (7th Cir.1996), a case with facts very much like the case at hand.[2] Gonzales worked at a factory in Michigan City, which was about forty miles from his home in Merrillville. He used his mini-van to drive four of his co-employees who lived in Merrillville from a local parking lot to their workplace, receiving $5.00 per day from each passenger for the eighty-mile round trip. Gonzales roughly calculated his weekly gas expense to be at least forty dollars, but never made any calculations as to his other expenses such as wear and tear or depreciation, nor did he attempt to amortize and allocate fixed costs such as tires, oil, and maintenance. He did not show how the amount he received related to the cost of the commute. Deposition testimony revealed that the employees considered the arrangement a car pool. *Id.* at 674.

In assessing the meaning of the term "shared-expense car pool," the Seventh Circuit observed that requiring formal expense accounting and allocation made little sense in light of the informal nature of most car pool arrangements. *Id.* at 677–78. Instead, the court adduced its own "rough estimates" of Gonzales' costs, compared them to what he received weekly from his passengers, and concluded that his expenses more than outweighed his revenue. *Id.* at 678. Buttress-

ing its calculations with passenger statements testifying that $5.00 a day was "fair" and "a good deal," which to the court further proved that the expenses were fairly proportioned, *id.* at 679, the Seventh Circuit concluded that this arrangement indeed constituted a "shared-expense car pool."

We agree with the Seventh Circuit's analysis and conclusions regarding "shared-expense" car pooling arrangements.

First, car pools are predominantly informal arrangements typically based on "ball-park" figures and "reasonable guesses" about the expenses incurred in the daily trip. *See Gonzales,* 86 F.3d at 678 n. 6. Unlike a single check arriving at the table of a group of friends out for lunch, the costs of commuting are not readily discernable or easily divisible. The expense per person can fluctuate daily with changes in the price of fuel, the number of riders on a given day, or the route taken, and it could be further complicated if the driver picks up each passenger at his or her home instead of at a central location.

Moreover, true expensing would require accounting for vehicle depreciation, and amortization and allocation of fixed costs like repairs and tune-ups. Such complicated accounting operations are made even more difficult if the driver must further distinguish between personal and car pool use of the vehicle. How often must the driver recalculate the amount she requests from each passenger: once a year? once a month? every time the price of gas changes? each time a different number of people ride? The Court of Appeals recognized the accounting morass that would result from true expensing, but concluded that without it "the owner is merely carrying passengers for a fee." *Meridian Mutual,* 659 N.E.2d at 213.[3]

---

**2.** Although *Gonzales* lists specific ways in which its facts differ from those in *Meridian Mutual Ins., Gonzales,* 86 F.3d at 679, we do not find the factual variances it mentions to be legally significant in distinguishing these two cases.

**3.** The Court of Appeals stated, "We recognize that the apportionment of expenses will rarely be exact. Shared-expense car pools are likely to be informal arrangements meant to decrease the difficulties of travel without imposing significant

accounting burdens on any individual." *Meridian Mutual Ins.,* 659 N.E.2d at 213 n. 3. On the other hand, it also said, "For the 'shared expense' car pool exception to serve its purpose within the policy, the passengers must not merely contribute but must contribute in proportion to the expenses actually incurred. Absent a proportionate allocation of expenses among the passengers, the owner is merely carrying the passengers for a fee." *Id.* at 213.

Our society encourages ride-sharing as a good way of decreasing engine emissions, alleviating congested roadways and highway wear and tear, and decreasing fuel consumption and expense. *See, e.g., Gonzales,* 86 F.3d at 679. Requiring car pool drivers to maintain standard accounting and expense allocation in order to qualify for protection under their insurance policies would presumably prompt some people to abandon car pooling altogether, a result disadvantageous to commuters as individuals and society as a whole.

Second, evidence of detailed accounting does not necessarily indicate "sharing of expenses." A high degree of expense tracking is actually more suggestive of a commercial enterprise than of a "proportional" sharing of expenses in a car pooling situation. The Seventh Circuit stated:

It seems inapposite that the policy exception for car pools, an essentially informal arrangement, requires such a level of formality in the calculation of expenses. If Gonzales had indeed operated his private vehicle as a business, keeping precise track of daily expenses, reflecting it in his tax returns and possibly even reporting it as a business endeavor with its benefits, and accounting for the fluctuating price of fuel, that seems to us the type of formal arrangement that was not intended by the policy exception for car pools. To the contrary, a precise formulation of expenses reflects a commercial endeavor and not a car pool arrangement initiated for convenience, efficiency, cost reduction and camaraderie.

*Id.* at 677.

Third, we do not see how the level of underwriting risk incurred by the carrier would change if Riggins *had* performed detailed expense calculations and allocations. How is the risk of accident increased, such that Meridian would not wish to insure Riggins' car-pooling arrangement, simply because she failed to link the amount she asked the others to contribute with her actual expenses? As the Seventh Circuit noted:

It makes little sense to focus so intently on the precise calculation of expenses.... The risk incurred by Gonzales in traveling with his co-employees remains the same whether the calculations of gas and mileage are made to the penny or whether each passenger chips in five bucks for the ride to and from work; either way a group of co-employees are sharing part of the expenses and enjoying the convenience, fun, and camaraderie of traveling together to and from their place of employment.

*Gonzales,* 86 F.3d at 678.

Rather than reading "shared-expense" to mean that expenses must "actually [be] shared on a ratable basis," *Meridian Mutual Ins.,* 659 N.E.2d at 213, we read it to address situations where the parties intend to share the burden of car pooling expenses, regardless of whether they perform exact calculations regarding the proportionate sharing of that burden.

The inquiry should be whether a reasonable person, after reviewing the totality of the circumstances surrounding the transportation arrangement, would conclude that the commuting participants were involved in a car pool[4] in which the non-driving participants contributed money to share the com-

---

4. The Court of Appeals defines "car pool" as "an arrangement whereby drivers and vehicles are rotated without an exchange of money." *Meridian Mutual Ins.,* 659 N.E.2d at 212. *See also Johnson v. Allstate Ins. Co.,* 505 So.2d 362, 364–65 (Ala.1987) ("A 'car pool' is 'a joint arrangement by a group of private automobile owners or drivers in which each in turn drives his car and takes the other passengers.'") (quoting Webster's Third New International Dictionary, Unabridged (1971)). We find this definition too narrow, as it fails to encompass car pool arrangements in which the participants share costs by way of monetary contribution to a principal driver, rather than by each taking turns employing his or her own vehicle. *See, e.g., Meridian Mutual Ins.,* 659 N.E.2d at 214 (Riley, J., dissenting) ("The plain meaning of 'shared expense car pool' is simply that the passengers contribute to the expense of sharing transportation to their place of employment."); Merriam Webster's Collegiate Dictionary 175 (10th ed.1993) (defining "car pool" simply as "an arrangement in which a group of people commute together by car"); *Gonzales,* 86 F.3d at 677 (citing one definition of "car pool" as "[a]n arrangement whereby several commuters travel together in one car, sharing costs and often taking turns providing the car used") (quoting American Heritage Dictionary (1982)).

muting burdens born by the driving participant.

The correlation of expenses to the amount contributed by each passenger may be one item to consider in reviewing this issue, but there are many other questions a reasonable person might ask in determining whether a commuting arrangement is a shared-expense car pool. One might be: "What appears to be the driver's primary motivation to participate (i.e. is the driver doing this to make money)?" Objective evidence which might help answer this question would be: whether the driver merely has an operator's license, or a more specialized form of driver's license;[5] whether the driver declares the money she receives from her passengers as income or lists her expenses as business deductions on her tax returns; whether the vehicle is owned by the driver or by a commercial entity; whether the driver holds herself out as providing transportation to the general public or a large group of people, or only to a small group that generally does not vary in participation; whether there is significant formality in the relationship between the driver and passengers, such as a written agreement; whether the driver has a purpose besides the travel itself for going from the point of departure to the point of arrival; and whether the driver uses the vehicle at other times for her own personal use. Evidence on these and other points will tend to establish whether the arrangement is a joint venture of shared burden or an enterprise existing for the profit of the driver.

■■■ In the present case, the evidence shows that Riggins did not participate in the commuting arrangement for a commercial purpose. She positively testified that she was *not* involved in this arrangement to make a profit. She did not declare the amount she received as income or list her expenses as business deductions on her taxes.[6] She stated that she believed the money she received was used entirely to cover the cost of the commute. There was no evidence that she had any form of specialized driver's

license, nor any indication that the arrangement's level of formality rose above the weekly payment of $17.00 to Riggins on either Friday or Monday, (i.e., there were no signed contracts, no tickets, no invoices or bills distributed or mailed to the passengers, etc). The van involved in the accident was titled in her name, and not that of a corporation or transportation company. While the arrangement had gone on for many years, there was relatively low fluctuation in participation. Moreover, the opportunity to ride was extended only to Thomson co-workers living in and around Odon, all of whom the driver knew personally. Finally, because she herself worked at Thomson, she was not making a trip that she otherwise would not have made but for the transportation arrangement with the other passengers.

The only evidence that could indicate that Riggins had a commercial motivation is her statement that she might have purchased her van with the transportation of her co-workers in mind:

> Q. [W]hat was your reason for buying the van [in 1989]?
>
> A. Well, uh, I needed a way to work, and some other people needed a way to work; so we just decided that—I decided that, uh—I had had a van before this, and we all just kind of pitched in and paid our—my expenses, really. And so when I got a new van, we just continued to do so.

(R. at 194). One could legitimately purchase a van in anticipation of transporting people as part of a car pool, however, instead of in anticipation of transporting people as part of a commuter service. In light of the other evidence from the record, we interpret her statement as indicating that she purchased the van in anticipation of continuing the group's shared-expense car pool.

Another legitimate question one might ask to determine the existence of a shared-expense car pool is how the passengers view the arrangement (i.e., do they think they are

---

5. In Indiana a person engaged in transporting for a commercial purpose the number of passengers Riggins was transporting would need a "public passenger's chauffeur's license". Ind. Code Ann. § 9–24–1–3 (West 1992).

6. Whether this was suitable as a matter of tax law is a question on which we do not express an opinion.

"paying for" their ride, rather than sharing the expenses of one)? For example, in *Gonzales* "[t]he deposition testimony clearly reflect[ed] that the employees considered themselves car pooling." *Gonzales*, 86 F.3d at 674. Although no passenger depositions appear in this record, Riggins said she believed they viewed the arrangement as a collective effort to share expenses, and not as payment for transportation services. Notwithstanding the self-serving nature of this declaration, it is the only evidence about the passengers' viewpoint.

Of course, whether the amount of money contributed by the passengers reasonably reflects the cost of the trip is highly pertinent. Meridian argues that the money Riggins received from passengers greatly exceeded the cost of the trip, implying that the parties really must not have intended to conduct a shared expense car pool. We disagree. Meridian bases its argument on federal "per mile" business expense deduction, which, when used to calculate Riggins' expenses, indicates that the 1992 commuting expenses would have been about $3500 less than what she would have received from her co-workers. We believe the rough estimates performed by the Seventh Circuit in *Gonzales*[7] are more appropriate, reflecting both the fact that calculating expenses in a car pool is not an exact science nor is it intended to be, and that certain rates and figures from one area of the law, like federal income tax, are not always appropriately applied in other areas of the law, such as insurance policy interpretation.

Of the $187 she received each week, only $79 remained after subtracting fuel and depreciation expenses alone. Further subtractions for upkeep (tires, brakes, oil, regular maintenance, repairs, etc.) cause the $79 surplus to diminish even further.

Besides upkeep expenses, the remaining $79 must also cover other costs born by Riggins which the other commuters did not bear. When a person makes an eighty-mile-per-day commute consisting of city streets, county roads and state highways, she gives up 90–120 minutes each day (not counting traffic jams and road construction) that she could have spent doing something other than driving.[8] This "opportunity cost" is part of the cost of commuting. Just as the passengers help bear the more obvious costs of the commute by contributing money, they might also reasonably help bear the opportunity costs of driving that the driver bears alone but for the monetary contributions of the others.[9]

Another cost born exclusively by the driving car pool member is the cleaning of the vehicle. Because of the daily travel, its exterior will get dirtier faster than if it remained parked and relatively unused, like the passengers' cars. Moreover, the interior is more prone to coffee stains, dirt from shoes, smudged windows, wrappers on the floor, etc., than the passengers' unused cars. Thus, the burden on the passengers to clean their vehicles regularly is lessened by the car pooling arrangement, while the driver's cleaning responsibilities remain, and may even increase, because of it.

We conclude that a reasonable person, after viewing the totality of the circumstances, would find Riggins, Ramsey, and the other commuters to have been involved in a shared-expense car pool. Our review has considered several questions reasonable people might ask in making such a determination. While these questions are helpful and probative, they do not herald a new "x-part test" for determining the existence of a "shared-expense car pool." The paramount consideration is whether a reasonable person, after reviewing the totality of the circumstances surrounding the transportation arrangement, would conclude that the commuting participants were involved in a car pool in which the non-driving participants contribut-

---

7. *See Gonzales,* 86 F.3d at 678 n. 6.

8. As the record states, the passengers, because they were not driving, did many other things which the driver was not able to do, such as sleeping, reading, and even knitting and crocheting.

9. This consideration not only justifies the $79 remaining after fuel and depreciation expenses, but it also justifies the passengers' practice of discounting a substitute driver's weekly contribution when he drove instead of Riggins.

ed money to share the commuting burdens born by the driving participant. Any evidence reasonably probative to that issue is relevant.

## V. Conclusion

Because Ramsey's policy with Meridian did not exclude coverage for bodily injury or property damage arising out of the use of a vehicle as part of a shared-expense car pool, the trial court was correct in awarding summary judgment to the appellees. Accordingly, we affirm the trial court.

DICKSON and SELBY, JJ., concur.

BOEHM, J., dissents with separate opinion in which SULLIVAN, J., joins.

BOEHM, Justice, dissenting.

We are interpreting an insurance policy that both the insured and the insurer agree was intended to provide coverage for ordinary use of an automobile, not use as a commercial carrier. The specific provisions involved are the exclusion for "carrying persons or property for a fee" and the recognized exception to that exclusion of a "shared-expense car pool."

I agree that it is not necessary for a car pool to maintain anything approaching detailed accounting in order to meet the standard for a "shared-expense car pool," and that informal arrangements to share commuting transportation are to be encouraged. For that reason I would indulge a presumption that informal arrangements among people who commute to a common destination are within the car pool exception to the policy exclusion. However, the factors identified by the majority seem to me to go too far in permitting and even encouraging an enterprise in the underground economy. In particular, the fact that the operator of a bootleg commercial carrier chooses neither to pay taxes nor obtain a commercial driver's license does not seem relevant to the car pool inquiry to me. Identifying these as factors favoring insurance coverage at the lower cost

afforded to everyday drivers instead of the higher premium charged commercial carriers only encourages skirting the tax and motor vehicle laws.

I also think that "expense" means only depreciation and out of pocket costs, not compensation for driving that the driver would do in any event to get herself to work. The "opportunity cost" as described by the majority would be incurred by Riggins regardless of whether eleven others or no one rode with her. Maj op. at 777. The fact that Riggins was paid to drive while others slept or read would be called compensation for services by the tax authorities and most ordinary citizens. Reduction of the passenger charge by $5.00 per day for any of the passengers who drive confirms that this arrangement included a compensation component to Riggins as the usual driver. As such, this looks to me like any other service business that also furnishes the equipment needed to provide the service. As the majority notes, the Internal Revenue Service mileage allowances may or may not be controlling in other contexts, but they give us some idea of whether this was a profitable enterprise or not. And the idea they give me is that it was indeed profitable in the range of $2,000 to $4,000 per year.[1]

It seems to me the test of a shared-expense car pool where the passengers furnish something other than their own driving and vehicles from time to time (in this case $17.00 in cash per week) should be no more and no less than 1) do the participants think they are sharing expenses or something more and 2) is the consideration within a reasonable ballpark estimate of the actual costs of providing the transport including depreciation. Here the factors identified, in particular the fact that the arrangement contemplates compensation to Riggins as the driver, overcome the presumption that an informal arrangement is a "shared-expense car pool." It seems to me that the Court of Appeals for the Seventh Circuit correctly decided *Gen.*

---

**1.** If we assume an 82 mile round trip at the IRS allowed deductible of 28 cents per mile it "costs" about $6,000 to operate the van. (82 miles × .28¢ × 5 days × 52 weeks = $5,969.60) Receipts total over $9,700. (11 passengers × $17 per passenger per week × 52 weeks = $9,724) Even assuming the IRS is niggardly in its standard allowance, this still leaves ample room for a profitable operation.

*Accident Ins. Co. of Am. v. Gonzales,* 86 F.3d 673 (7th Cir.1996) on the facts of that case, and in doing so pointed to several factors that distinguish it from this case. These include 1) Gonzales offered "rough estimations" and "passenger testimony" that the five dollars per day from passengers at best covered only a portion of his expenses, 2) if Gonzales did not go to work the passengers took the bus or drove themselves in a vehicle other than the one owned by Gonzales, and 3) four to six people were transported by Gonzales in a vehicle that he used for his personal transportation as opposed to the eleven passengers transported by Riggins in a vehicle purchased specifically to engage in this commuter service. *Id.* at 679.

SULLIVAN, J., concurs.