

FILED

Oct 18 2019, 4:49 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

George M. Plews
Jonathan P. Emenhiser
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

James J. Hutton
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Global Caravan Technologies, Inc.; Christopher Douglas; Husheng Ding; Kyle Fang; Chris Tzeng; C.H. Douglas & Gray, LLC; Thomas Gray; Doris Roberts; and Red Wing Capital, LLC,

*Appellants-Defendants,*

v.

The Cincinnati Insurance Company,

*Appellee-Plaintiff*

October 18, 2019

Court of Appeals Case No.
18A-PL-2479

Appeal from the Marion Superior Court

The Honorable James B. Osborn, Judge

Trial Court Cause No.
49D14-1709-PL-34008

**May, Judge.**

[1]     Global Caravan Technologies, Inc. ("Global"), Christopher Douglas, Husheng

Ding, Kyle Fang, and Red Wind Capital, LLC ("Red Wing"), (collectively,

"Defendants")[1] appeal the trial court's grant of summary judgment in favor of The Cincinnati Insurance Company ("Cincinnati") in Cincinnati's action requesting a declaration that it had no obligation to defend Defendants in other litigation. Defendants raise multiple issues, which we restate as:

> 1. Whether Global's voluntary intervention in a claim filed by Charles Hoefer Jr. is a "suit" under the language of Global's insurance contract with Cincinnati; and

> 2. Whether the insurance contract's Employment Related Practices Exclusion ("ERP Exclusion") relieves Cincinnati of any obligation to provide defense and indemnification coverage to Douglas, Ding, and Fang for Hoefer's lawsuit.

We affirm.

# Facts and Procedural History

In January 2013, Global was formed by Charles Hoefer Jr. and sought to enter the recreational vehicle market. At relevant times, Hoefer possessed experience and intellectual property rights to materials related to manufacturing recreational vehicles. Douglas, Ding, and Fang were investors in Global; Douglas and Ding were executive officers of Global and Fang was a director at Global. Red Wing is a separate business entity owned by Douglas, Ding,

---

[1] The other named defendants in this case do not join in this appeal; however, we list them on the cover because a party at the lower court is a party on appeal. *See* Indiana Appellate Rule 17(A) ("A party of record in the trial court . . . shall be a party on appeal.").

Thomas Gray, Doris Roberts, and Steve Coons. Red Wing is an investor in Global. Cincinnati insures Global.

[3] Through a series of events, Hoefer was removed as owner of Global. On May 1, 2014, Hoefer filed a complaint in Marion County ("Hoefer Litigation") against Ding, Douglas, Fang, Red Wing, Gray, Roberts, Christopher Tzeng,[2] C.H. Douglas & Gray, LLC,[3] and Steve Coons.[4] In that complaint, Hoefer presented several claims, including conspiracy, unjust enrichment, securities fraud, common law fraud, constructive fraud, breach of fiduciary duty, defamation, defamation *per se*, theft, and interference with contractual relations.

[4] On May 14, 2014, Global, as the policyholder, notified Cincinnati of the Hoefer Litigation and requested defense and indemnification for Global, Douglas, Ding, and Fang. Cincinnati agreed to provide defense of Douglas, Ding, and Fang, and it assigned defense counsel for Douglas, Ding, and Fang without consulting Global. Global insisted Cincinnati provide defense to all parties related to Global, including Global, which was not a named defendant in the Hoefer Litigation. Global argued the counsel assigned to Douglas, Ding, and Fang was unacceptable due to an alleged conflict of interest. Cincinnati agreed to assign different counsel to Ding, Douglas, and Fang, but stated it would pay only a portion of the defense if different counsel was selected. Cincinnati

---

[2] Tzeng works for Red Wing.

[3] C.H. Douglas & Gray is related financially to Red Wing and is owned, in part, by Douglas.

[4] Hoefer named Coons in his claim, but Coons is not a party to the action before us.

denied Global's request for defense beyond that of Ding, Douglas, and Fang. Global rejected Cincinnati's response to their request and retained separate counsel unapproved by Cincinnati.

[5] On July 7, 2014, Global moved to intervene in the Hoefer Litigation, arguing that some of the claims related to incidents occurring at Global and that Hoefer sought to obtain Global assets as part of his claims. The trial court granted Global's request over Hoefer's objection. On October 8, 2014, Hoefer amended his claim. The amended claim did not include any allegations against Global. On December 1, 2014, Ding and Douglas filed offensive counterclaims against Hoefer. Also on December 1, 2014, Global filed an answer to Hoefer's amended complaint and asserted an offensive counterclaim against Hoefer.

[6] Meanwhile, in federal court, on October 8, 2014, Cincinnati filed an action seeking declaratory judgment that it had no duty to defend or indemnify Global in the Hoefer Litigation. Cincinnati and Global cross-moved for summary judgment. The district court granted summary judgment in favor of Cincinnati, and Global appealed. The Seventh Circuit Court of Appeals did not reach the merits of the appeal, as it determined it did not have jurisdiction over the matter because Hoefer was not a citizen of Indiana at the time the district court action was filed.

[7] While the federal claims were pending, Douglas, Ding, Fang, and Red Wing retained Delk McNally, LLP, to defend them in the Hoefer Litigation. Douglas, Ding, Fang, and Red Wing incurred $50,715.37 in attorney's fees and

costs and submitted the relevant invoices to Cincinnati for payment. Cincinnati has not paid those invoices. As part of its involvement in the Hoefer Litigation, Global retained Ice Miller, LLC, and incurred $90,661.31 in attorney's fees and costs, which Cincinnati has not reimbursed.

[8] On September 5, 2017, CIC filed the present action, which was a complaint for declaratory judgment asking the trial court to declare that CIC is not required to defend or indemnify Defendants in the Hoefer Litigation. Defendants filed an answer and counterclaim. On March 7, 2018, Defendants filed a motion for partial summary judgment. On April 20, 2018, CIC filed a cross-motion for summary judgment. The trial court held oral argument on the motions on July 31, 2018, and September 17, 2018. The trial court denied Defendants' partial motion for summary judgment and granted summary judgment in favor of CIC, finding in relevant part: (1) CIC had no obligation to defend Global because "suit" as defined by the insurance contract does not include Global's act of voluntarily intervening in the Hoefer Litigation, and (2) the ERP Exclusion relieves CIC from any obligation to provide defense or indemnification coverage for Douglas, Ding, and Fang.

# Discussion and Decision

## Summary Judgment Standard of Review

[9] We review summary judgment using the same standard as the trial court: summary judgment is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law. *Rogers v. Martin*, 63 N.E.3d 316, 320 (Ind. 2016). All facts and reasonable inferences are construed in favor of the non-moving party. *City of Beech Grove v. Beloat*, 50 N.E.3d 135, 137 (Ind. 2016). Where the challenge to summary judgment raises questions of law, we review them *de novo. Rogers*, 63 N.E.3d at 320.

[10]     We do not modify our standard of review when the parties make cross motions for summary judgment. *State Auto Ins. Co. v. DMY Realty Co., LLP*, 977 N.E.2d 411, 419 (Ind. Ct. App. 2012). "Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Id*. When the trial court makes findings and conclusions in support of its order regarding summary judgment, we are not bound by such findings and conclusions, but they aid our review by providing reasons for the decision. *Allen Gray Ltd. P'ship IV v. Mumford*, 44 N.E.3d 1255, 1256 (Ind. Ct. App. 2015). We will affirm a summary judgment order on any theory or basis found in the record. *Id*.

## Insurance Policy Interpretation Standard of Review

[11]     When interpreting an insurance policy, we give plain and ordinary meaning to language that is clear and unambiguous. *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998). Policy language is unambiguous if reasonable persons could not honestly differ as to its meaning. *Id*. To this end, we look to see "if policy language is susceptible to more than one interpretation." *Id*. If an insurance policy contains ambiguous provisions, they

are construed in favor of the insured. *Id.* "This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the customer. The insurance companies write the policies; we buy their forms or we do not buy insurance." *Id.*

### *Duty to Defend Global*

[12] The insurance contract between Global and Cincinnati provides for defense of the insured "against any 'suit' seeking damages." (App. Vol. II at 72.) The policy further defines:

> 21. "Suit" means a civil proceeding in which money damages because of "bodily injury", "property damage" or "Personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:
>
>> a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;
>>
>> b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or
>>
>> c. An appeal of a civil proceeding.

(*Id.* at 85.)

[13] The trial court determined Global's voluntary intervention in the Hoefer Litigation did not qualify as a "suit" under the insurance policy:

An insurer's duty to defend its insured is broader than its duty to indemnify. Yet, the duty to defend is determined by the examination of the "allegations of the complaint coupled with those facts known to or ascertainable by the insurer after reasonable investigation." "'[A]n insurer may properly refuse to defend where an independent investigation reveals a claim patently outside the risks covered by the policy.'" Moreover, when a policy exclusion applies to preclude coverage, the insurer has no duty to defend its insured. Therefore, while an insurer's duty to defend is broader than its duty to indemnify an insured, it is not boundless. When an insurer has no duty to defend, it also has no duty to indemnify its insured under the policy.

The Coverage B insuring agreement provides that [Cincinnati] has the right and duty to defend [Global] against any "suit" seeking to hold the named insured legally liable for damages because of covered "personal and advertising injury." However, [Cincinnati] has no duty to defend insured [Global] under the [Cincinnati] Policy unless a "suit" has been brought against the insured for potentially covered damages in the [Hoefer Litigation]. The term "suit" is defined in the [Cincinnati] Policy to mean, in relevant part, "a civil proceeding in which money damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." While [Global] is an insured, it still has the burden to prove the Amended Complaint in the Underlying Lawsuit is a "suit" against [Global] to satisfy the Coverage B insuring agreement requirement.

The Defendants/Counterclaimants overcomplicate the issue of whether Hoefer's Amended Complaint constitutes a "suit" against [Global]. The Amended Complaint, itself, establishes that Hoefer's claims and allegations are only asserted against the Named Defendants, not [Global]. As proven by the designated evidence and the court record in the Underlying Lawsuit, through motion practice Hoefer deliberately asserted no claims

for damages against [Global] in his Amended Complaint. Like Hoefer, the Defendants/Counterclaimants admit the Amended Complaint asserts no claims for damages against [Global], which is necessary to constitute a "suit" under the [Cincinnati] Policy. Despite their admission, the Defendants/Counterclaimants try to convince the Court that [Global's] voluntary intervention as a Defendant to assert a non-compulsory, offensive Counterclaim against Hoefer in the Underlying Lawsuit renders the Amended Complaint a "suit" against [Global]. The Court is not persuaded.

The Court is familiar with the procedural history of the Underlying Lawsuit since the matter is before it. Any characterization that this Court *sua sponte* ordered [Global's] involvement in the Underlying Lawsuit is not substantiated by the designated evidence or the court record in the Underlying Lawsuit. As the court record demonstrates, Hoefer sought to amend his Original Complaint only after Hoefer opposed [Global's] motion to intervene as a voluntary Defendant in the Underlying Lawsuit to assert a Counterclaim against him. On September 29, 2014, Hoefer sought leave to amend his Original Complaint to provide a more definitive statement as to his claims upon the request of several Named Defendants, and to add claims for piercing the corporation veil of [Red Wing] (not [Global]), civil conspiracy and unjust enrichment against the Named Defendants. As evident by the Amended Complaint, itself, [Global] was not added as a Named Defendant and no claims for damages are asserted against the corporation.

Additionally, intervening Defendant [Global's] filing of an Answer to Hoefer's Amended Complaint to assert a Counterclaim against Hoefer in the Underlying Lawsuit does not render Hoefer's Amended Complaint a "suit" against [Global] either. Neither [Global's] Answer nor Counterclaim filed in the Underlying Lawsuit alter who the Amended Complaint is asserted against (the Named Defendants, not [Global]) or its

claims and allegations. As the designated evidence and court record establish, Hoefer did not seek to further amend the Amended Complaint.

Accordingly, the Underlying Lawsuit does not constitute a "suit" before [Global] was granted leave to voluntarily intervene as a Defendant or after [Global's] voluntary intervention and the filing of its Answer and Counterclaim in the Underlying Lawsuit. [Global's] voluntary intervention as a Defendant in the Underlying Lawsuit and [Global's] Counterclaim against Hoefer do not serve as a substitute for a "suit."

The Defendants/Counterclaimants have invited this Court to ignore well-settled Indiana law and the [Cincinnati] Policy language to impose a duty to defend upon [Cincinnati] in the absence of a "suit" against [Global]. The Court declines the invitation. Therefore, in the absence of a required "suit" against [Global], the Court finds that [Cincinnati] has no duty to defend or indemnify [Global] under the [Cincinnati] Policy in the Underlying Lawsuit before or after [Global's] voluntary intervention and assertion of a Counterclaim. The Court also finds that [Cincinnati] has no contractual obligation under the [Cincinnati] Policy to reimburse [Global] any costs or expenses, including attorneys' fees, it incurred to voluntarily intervene in the Underlying Lawsuit.

(App. Vol. II at 27-9) (internal citations to record and external citations omitted; footnotes omitted). Global argues its voluntary intervention in the Hoefer Lawsuit qualifies as a "suit" under the language of the insurance contract and thus Global is entitled to defense under the policy.

[14] We considered a somewhat similar set of facts in *Mahan v. American Standard Insurance Company*, 862 N.E.2d 669 (Ind. Ct. App. 2007), *trans. denied*. In that

case, on October 25, 2003, Mahan was involved in an accident during which seven people were injured. Mahan's automobile insurance policy with American Standard provided "liability limits for bodily injury in the amount of $50,000 per person and $100,000 per accident." *Id*. at 671. The policy further stated: "We will defend any suit or settle any claim for damages payable under the policy as we think proper. HOWEVER, WE WILL NOT DEFEND ANY SUIT AFTER OUR LIMIT OF LIABILITY HAS BEEN PAID." *Id*. (emphasis in original).

[15] Based on the injuries incurred, American Standard anticipated the personal injury claims would exceed the policy limits. Therefore, on December 1, 2003, it sent Mahan a certified letter explaining the personal injury damages likely would exceed the limits of his policy and reminding him he would be personally responsible for his defense of any damage claims exceeding his policy limit. *Id*. American Standard also reaffirmed its commitment "to protect [his] interest within the provisions of [his] policy." *Id*.

[16] On March 1, 2004, American Standard filed a complaint in interpleader against Mahan and the victims of the accident and asked the court to allow American Standard to pay the policy limit of $100,000 to the court for distribution by the court to the seven injured people as the court deemed appropriate. *Id*. at 672. American Standard's complaint also requested that, should the trial court allow it to pay $100,000 to the court for appropriate distribution at the court's discretion, that American Standard was then relieved of any further obligation to Mahan under the policy with regard to the accident. *Id*.

Mahan filed an answer, contending American Standard had "an affirmative duty to afford defense to Mahan in this cause of action, and to afford such defense at every stage of the proceedings." *Id*. At a hearing on October 28, 2004, the victims agreed to the distribution of the interpleaded amount. Mahan did not appear at the hearing so the issue of whether American Standard had a duty to defend Mahan remained pending. *Id*. On November 19, 2004, Mahan filed a counterclaim against American Standard, alleging American Standard had

> breached its duty to defend Mahan by failing to attempt to secure a release of further claims by third parties against Mahan within the limits of the policy of insurance between [American] and Mahan; and, by failing to defend Mahan prior to interpleading policy limits into the court; and, by interpleading policy limits into the court before suit having been filed by third party claimants; and, by failing to advise Mahan prior to interpleader of the potential of excess liability so that Mahan could take steps to defend himself from excess liability to third party claimant.

*Id*. at 673.

On December 29, 2004, the trial court entered a consent decree between American Standard and the victims for distribution of the $100,000 in interpleaded funds and indicated the payment was in full and complete satisfaction of the injured people's claims against American Standard. *Id*. The trial court noted in its order that Mahan's counterclaim remained pending. Mahan and American Standard filed cross motions for summary judgment on May 4, 2005, and June 2, 2005, respectively. The trial court held a hearing on

the competing motions on July 26, 2005. On October 21, 2005, the trial court entered an order granting American Standard's motion for summary judgment. In doing so, the trial court found:

> 23. The issue of whether [American Standard] owed a duty to defend its insured [Mahan] against claims arising out of the October 25, 2003 accident became moot upon the entry of the consent decree precluding any claims against [Mahan] by those injured in the accident.

> 24. [American Standard] did not owe a duty to defend [Mahan] in the declaratory judgment action requesting a determination of the enforceability of the [American Standard] policy's duty to defend clause.

*Id*. at 674.

[19] Mahan appealed, arguing the trial court erred when it granted summary judgment in American Standard's favor because American Standard could not relieve itself of its duty to defend Mahan under the automobile insurance policy by filing a complaint in interpleader. *Id*. at 676. Our court disagreed, holding American Standard's duty to defend under the automobile insurance policy had not been triggered because none of the injured parties had filed suit against Mahan. In so holding, our court used the plain and ordinary meaning of the word, "suit": "an action or process in a court for the recovery of a right or claim." *Id*. (external citation omitted).

[20] As stated in *Mahan* and in the trial court's order in the case before us, an insurance company's duty to defend is "determined from the allegations of the

*complaint* and from the facts known or ascertainable by the insurer after an investigation had been made." *Ind. Farmers Mut. Ins. Co. v. Ellison*, 679 N.E.2d 1378, 1382 (Ind. Ct. App. 1997) (emphasis added), *trans. denied*. Here, the Hoefer's amended complaint did not name Global as a defendant. Therefore, there were no allegations in the complaint for Cincinnati to investigate. Global's voluntary intervention in the Hoefer litigation against the named defendants, some of whom were Global shareholders and/or employees, does constitute a "suit" under the plain language of the contract or the plain and ordinary meaning of the word, because no party has claimed Global owes damages of any kind.

[21]  *Mahan* is slightly distinct from the facts before us because, in this case, Global sought to intervene in a pending matter. The issue of whether a voluntary intervention in a *pending* matter constitutes a suit is an issue of first impression in Indiana, and we therefore may look for guidance from our sister jurisdictions. *See McCallister v. McCallister*, 105 N.E.3d 1114, 1118 (Ind. Ct. App. 2018) ("Where no Indiana case has addressed an issue, we may look to decisions from other jurisdictions for guidance."). To that end, *One-Gateway Associates v. Westfield Ins. Co.*, 184 F.Supp. 2d 527 (S.D. W. Va. 2002), follows the reasoning used in *Mahan* and applies it to facts better aligned to the case before us.

[22]  In *One-Gateway Associates,* Retail Designs, a landowner, sued the West Virginia Department of Transportation, Division of Highways ("DOH") following an unfavorable result at the circuit court level regarding the taking of Retail

Designs' land for the purpose of providing a frontage road for a new Super Wal-Mart. Retail Designs sought a permanent injunction against DOH because DOH had opened to the public a temporary construction access road after its original frontage road plan had failed, and that road "effectively condemned" Retail Designs' property without compensation. *Id*. at 529.

[23] One-Gateway had been contracted by Wal-Mart to construct the originally-planned frontage road and then convey it to DOH. After Retail Designs filed suit against DOH, One-Gateway sought to intervene to "protect its claimed interest" in the subject matter of the litigation, the frontage road. *Id*. at 530. After being permitted to intervene in the litigation, Retail Designs filed an amended complaint, which named One-Gateway as a party, but explicitly stated "[t]he purpose behind the filing of this Complaint is to provide One-Gateway with the opportunity to present its arguments against the closure of the converted construction entrance." *Id*. at 531 (internal citation omitted).

[24] One-Gateway subsequently filed a claim against its insurer, Westfield, alleging Westfield had a duty to defend One-Gateway in the Retail Designs action under two of One-Gateway's insurance policies with Westfield. In response, Westfield moved for summary judgment, arguing the policies' language did not require Westfield to defend One-Gateway as part of the Retail Designs claim. The contract between One-Gateway and Westfield had similar provisions to those in the contract between Global and Cincinnati in that both included a duty to defend any suit which sought damages under "(1) bodily injury and property damage [and] (2) personal and advertising injury[.]" *Id*. at 533.

Based on those contract provisions, the District Court in *One-Gateway* granted summary judgment in favor of Westfield, holding:

> Based on the foregoing language, no coverage or duty to defend is present under the three Insuring Agreements for a variety of reasons. Foremost, coverage and defense duties do not arise because Retail Designs seeks no damages against One-Gateway. Only injunctive relief is sought in the Amended Complaint filed in the Circuit Court of Nicholas County. Further, it appears the injunctive relief is sought in actuality only against DOH. One-Gateway is a party to the case only because it demanded to be added by way of its petition for writ of prohibition. The requested payment by Westfield of One-Gateway's associated fees and costs resulting from the latter's voluntary, and indeed hard-fought, admission to the state court action is not supported by any coverage or defense-duty language found in the parties' insurance agreements.

*Id*. at 533-4.

The facts before us are almost identical to those in *One-Gateway*. In its brief to support its motion to intervene in the Hoefer Litigation, Global claimed:

> The actions that form the basis of Hoefer's Complaint were not taken by the named defendants, but rather by [Global]. It is axiomatic that [Global] has a legal interest in defending its own actions, which are at the center of the subject matter of this litigation. Furthermore, [Global] has a direct and immediate interest in the ultimate disposition of the case, as Hoefer seeks to obtain corporate assets and corporate control. [Global] seeks to intervene to defend each and every [Global] action Hoefer challenges, regardless what "count" Hoefer refers to it as, and to protect its assets and ownership.

(App. Vol. VI at 130.) The trial court granted Global's request to intervene on October 8, 2014. The same day, Hoefer filed an amended complaint but did not make any claims against Global or request damages from Global. Like in *One-Gateway*, Global's intervention in the pending Hoefer Litigation was completely voluntary and there did not exist a claim for damages against Global, even after Hoefer amended his complaint following Global's intervention. Thus, we conclude the trial court did not err when it determined Global's action was not a "suit" under the insurance contract with Cincinnati. Cincinnati therefore did not have a duty to defend Global in the Hoefer Litigation.

## Duty to Defend Douglas, Ding, and Fang

[27] The insurance contact between Global and Cincinnati contains an exclusion for employment related practices ("ERP Exclusion"), which states:

> This insurance does not apply to:
>
> * * * * *
>
> (m). Employment Related Practices
>
> "Personal and advertising injury" to:
>
> > (1) A person arising out of any:
> >
> > > (a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person . . .

(App. Vol. II at 73-4.)

[28] Global argues the terms "arising out of" and "employment related" are ambiguous in the ERP Exclusion and thus we must interpret the language of the contract to favor Global. Should we determine those terms are unambiguous, Global then argues the defamatory comments alleged in the Hoefer Litigation do not arise out of Hoefer's employment relationships with Ding, Douglas, and Fang; the ERP Exclusion does not apply to the facts before us; and Cincinnati is required to provide coverage under the insurance contract.

### *"Arising Out Of"*

[29] Regarding the interpretation of the term "arising out of" the trial court relied on *Barga v. Indiana Farmers Mut. Ins. Group*, 687 N.E.2d 575, 578 (Ind. Ct. App. 1997), *reh'g denied*, *trans. denied*, and *Grinnell Mut. Reinsurance Co. v. Ault*, 918 N.E.2d 619, 626 (Ind. Ct. App. 2009):

> The Court finds that the phrase "arising out of" is not ambiguous as applied to the "employment-related" defamation claims in the Underlying Lawsuit. Even if this Court were to interpret "arising out of" to require an "efficient and predominating cause," as

articulated in *Barga*, the ERP exclusion would still preclude coverage for the Underlying Lawsuit defamation claims. In his Amended Complaint, Hoefer alleges the sustained injury to his professional reputation was caused by Ding, Douglas and Fang's defamatory statements. The efficient and predominate cause of injury to Hoefer's professional reputation is the alleged employment-related defamatory statements made by Ding, Douglas and/or Fang, individually, and ostensibly through [Global] while under their illegitimate control. As stated in *Grinnell*, the causal connection between his injured professional reputation and the alleged employment-related defamatory statements could not be more direct.

(App. Vol. II at 37.) Defendants argue the term "arising out of" is ambiguous and thus it must be construed in their favor. We disagree.

[30] As we have long held, "[a]n insurance contract will be ambiguous only if reasonable persons upon reading the contract would differ as to the meaning of its terms, and an ambiguity is not established simply because controversy exists, and one party's interpretation of the contract is contrary to that asserted by the opposing party." *Meridian Mut. Ins. Co. v. Cox*, 541 N.E.2d 959, 961 (Ind. Ct. App. 1989), *trans. denied*. The term "arising out of" has been examined multiple times by this Court, albeit in the context of whether an insurance company was liable to a third party. *See Barga*, 687 N.E.2d at 578 (interpreting "arising out of" in a case involving a third party and the insurance company); *and see Grinnell*, 918 N.E.2d at 627-8 (interpreting "arising out of" as it pertained to payment of a claim to a third party). Defendants argue that because *Barga* and *Grinnell* address the issue as framed between a third party and the insurer, those cases do not apply here because in this case the issue of ambiguity exists

between a policyholder and an insurance company. Defendants assert because there is no Indiana case on point, we must look to our sister jurisdictions for guidance.

[31] However, in *Moons v. Keith*, 758 N.E.2d 960 (Ind. Ct. App. 2001), *trans. denied*, we examined the phrase "arising out of" as it related to coverage claimed by the policyholder. In *Moons*, Williams and Moons were injured when they were traveling in their car and were shot seventeen times by Keith, who was traveling in another car. *Id*. at 961-2. Williams sought coverage for his injuries and Moons' injuries under the uninsured motorist benefits provision of his automobile insurance with State Farm Insurance Company. State Farm denied coverage, contending Williams' and Moons' injuries did not "arise out of" Keith's use of his uninsured vehicle. *Id*. at 962. Williams and Moons filed a claim against State Farm and Keith, and the trial court agreed with State Farm that Williams and Moons' injuries did not "arise out of" Keith's use of his vehicle. Williams and Moons appealed. *Id*.

[32] On appeal, our court examined past cases interpreting the phrase "arising out of," including *Ind. Lumbermens Mut. Ins. Co. v. Statemans Ins. Co*., 260 Ind. 32, 291 N.E.2d 897 (1973), upon which the holdings in *Barga* and *Grinnell* rely. Like *Barga* and *Grinnell*, *Lumbermens* examined the phrase "arising out of" as it related to whether a homeowner's policy or a commercial truck liability policy was responsible for the payment of injuries incurred when a delivery truck driver fell down a homeowner's stairs while he was delivering a water softener. *Id*. at 32, 291 N.E.2d at 898. In *Lumbermens*, our Indiana Supreme Court

recognized its interpretation of the term "arising out of" was not aimed at construing the contract in favor of the insurance company or the policyholder, and thus the Court could "seek out the general intent [of the language in the insurance contract] from a neutral stance." *Id*. at 34, 291 N.E.2d at 899.

[33] *Lumbermens* held for an injury to "arise out of" the use of a vehicle, the use of the vehicle must be the "efficient and predominating cause" of the injury. *Id*. In so holding, our Indiana Supreme Court explained:

> Before there is coverage under a policy extending to loading and unloading, there must be some connection between the use of the insured vehicle and the injury, and unless the court can determine that the loading or unloading of the vehicle was an efficient and producing cause of the injury, there is no right of indemnity for the accident. In other words, liability of an insurance company under the policy depends on the existence of a causal relationship between the loading or unloading and the injury, and if the injury was proximately due to the unloading, the insurance company is liable, while if the accident had no connection with the loading or unloading there is no liability.

*Id*. (quoting 8 Blashfield, Automobile Law & Practice § 317.10 (1966)).

[34] In *Moons*, our court applied *Lumbermens* to a situation involving a dispute in coverage between an insurance company and a policyholder. The court stated, "in order to find coverage, there must be a causal connection or relationship between the vehicle and the injury." *Moons*, 758 N.E.2d at 964. The same is true in the case before us. As the dispute about the existence of coverage for Ding, Douglas, and Fang is between the policyholder, Global, and the

insurance company, Cincinnati, we conclude the term "arising out of" is not ambiguous. It is well-established that coverage exists when there is a "causal connection or relationship" between the injury and the alleged object of the insurance, here the alleged actions of the insureds.

### *"Employment Related"*

[35]    Regarding the interpretation of the term "employment related," the trial court found:

> In the Underlying Lawsuit, Hoefer alleges that Ding, Douglas and Fang made defamatory statements about him which injured his professional reputation while he was still employed with [Global] and serving as its CEO and a director on the Board. He also alleges that his professional reputation was injured by a public statement issued by Ding, Douglas and Fang, ostensibly through Global while under illegitimate control, in RV industry media outlets. In the public statement, Ding states that Hoefer's Underlying Lawsuit "demonstrates the same emotional, *irrational* and *dangerous behavior* that led to his necessary separation from the company." (Emphasis added.)

> None of the alleged defamatory statements involve a relationship between Hoefer and Ding, Douglas and Fang outside his [Global] employment. This Court finds that the alleged defamatory statements that caused injury to Hoefer's professional reputation, relate to and are connected to his [Global] employment, including Ding's statement that Hoefer's irrational and dangerous behavior necessitated his termination as [Global] CEO and his removal as a [Global] director. The "employment-related" defamation claims are precisely the claims that the contracting parties – [Cincinnati] and [Global] – agreed are excluded by the ERP exclusion under the [Cincinnati] Policy.

(App. Vol. II at 21.) In so concluding, the trial court relied upon *Peerless Indem. Ins. Co. v. Moshe & Stimson LLP*, 22 N.E.3d 882 (Ind. Ct. App. 2014), *trans. denied*. Defendants nevertheless argue the term "employment-related" is ambiguous because there exists non-binding authority from our sister jurisdictions that support their contention. We disagree with that contention.

[36] In *Peerless*, siblings owned a law firm together. When Moshe, the sister, attempted to leave the law firm, her brother, Stimson, allegedly made statements that she considered defamatory. Moshe sued Stimson, and Stimson filed a claim under the law firm's insurance policy for defense and indemnification. *Id*. at 883. Peerless, the insurance company, filed a summary judgment motion arguing it had no duty to defend Stimson because the alleged defamation fell under the insurance policy's exclusion for employment-related practices. *Id*. The trial court granted summary judgment in favor of Stimson, and Peerless appealed.

[37] On appeal, we determined the main issue before us was whether the term "employment-related" was ambiguous. Stimson argued the term was ambiguous because the parties disagreed as to its meaning. *Id.* at 886. We disagreed and noted "employment-related" was not ambiguous "simply because a controversy exists and [Stimson's] interpretation differs from Peerless's." *Id*. The same is true here - the term "employment-related" is not ambiguous for the mere fact that Defendants think it is, and we decline to conclude the term is ambiguous as used in the insurance contract.

### Application of ERP Exclusion

[38]     In determining the meaning of "employment-related" as it pertained to the insurance contract, our court reasoned in *Peerless*:

> Black's Law Dictionary defines "employment" in many ways, including "the quality, state, or condition of being employed; the condition of having a paying job." Black's Law Dictionary 641 (10th ed. 2014). "Related," in turn, means "connected in some way; having relationship to or with something else...." *Id.* at 1479. Applying these plain and ordinary definitions, we conclude - as the trial court initially did - that [Moshe's] claims against her brother relate to her job: after [Moshe] told [Stimson] she would be leaving the firm, he allegedly refused to dissolve the partnership, seized control of the firm's assets and refused to pay [Moshe] her regular income, refused to turn over client files and certain personal property belonging to [Moshe], and began making "accusations about [Moshe's] personal integrity and her professional competence." Appellant's App. p. 168. These acts are connected to [Moshe's] employment at Moshe & Stimson LLP; as a result, they are not covered under the policy by way of the exclusionary clause.

*Id.* at 886.

[39]     The same reasoning applies to the case before us. In its order, the trial court summarized Hoefer's defamation claims against Douglas, Ding, and Fang:

> In the Underlying Lawsuit, Hoefer asserts the following allegations in support of his defamation, defamation per se and conspiracy to defame claims:
>
> 13. The Named Defendants - including Ding, Douglas, and Fang - "sabotage[d] . . . and defame[d] him in order to preserve

their selfish and illegal interests," because they were "so driven to complete their China land deal."

14. His corporation, [Global], "many of his equities, his job, his dreams, his intellectual property, and his promised long-term prospects were stolen by - and millions of dollars in [Global equities] were destroyed by (and his professional reputation disparaged by) - people who were responsible to him as fiduciaries seeking selfish enrichment." The Named Defendants "have destroyed [Global], defrauded [Hoefer] of promises of equity in other ventures, and irreparably harmed and defamed [him] - all in an effort to quickly line their own pockets with ill-gotten cash in China."

15. A March 7, 2014 [Global] board meeting was held and he, Ding, Douglas and Fang were in attendance. During the meeting, Ding informed Hoefer that "Weichai was the Defendants' only focus for capital, that the Defendants' [sic] planned to gut [Global], and that [he] would be offered millions in quick cash if he joined the plan." Ding also allegedly told Hoefer that "Weichai was the only investment prospect for [Global] (Ding confirmed this on March 9, 2014, writing 'Weichai may be the only viable option')." Later, "[o]n April 5, 2014, Ding wrote to [Hoefer,] Douglas, and Fang that he never stated Weichai was the only investment option for [Global], Ding called [Hoefer] a liar, wrote that luxury manufacturing would only remain in the U.S. for the foreseeable future, and ranted with a lengthy dissertation laden with lies and material contradiction."

16. In April 2014, the Named Defendants' - including Ding, Douglas and Fang - efforts to "oust [him] from [Global] included disparagements and character assassinations directed to [Global's] employees, attorneys, investors, partners and other individuals." These defamations were professionally brutal,

falsely alleging that [he] had stolen intellectual property and that [he] was a liar."

17. Purdue University's Director of Motorsports Danny White left a voicemail calling Hoefer a "con-man" "after talking with Ding in mid-April 2014" which is "[e]vidence that these defamations" occurred while Hoefer was [Global's] CEO.

18. [Global's] intellectual property attorney, [sic] also told Hoefer that "Douglas and Ding had fully informed him of [his] 'theft' through the month of April 2014."

19. While under the Named Defendants' illegitimate control of [Global], Ding, Douglas and Fang "publicly humiliated [him] by issuing through [Global] a public and severely defamatory statement against [him] after kicking him to the curb, calling [him] 'dangerous' and 'irrational' in major RV industry media such as RV Business, RV-Pro, and RV Daily Report, and also in the Indianapolis Business Journal." The May 9, 2014 RV Daily Report article entitled "Global Caravan Technologies Responds to Hoefer Suit" referred to Hoefer's Amended Complaint provides, in relevant part:

'Mr. Hoefer never made any cash investment in the company. While Mr. Hoefer remains a minority shareholder, his attempts to claim [Global] as his own at the expense of other shareholders is just wrong.' Ding explained, 'In fact, his lawsuit, which reads as sensationalistic, defamatory, and error-ridden, demonstrates the same emotional, irrational and dangerous behavior that led to his necessary separation from the company.'

(App. Vol. II at 18-20) (internal citations and emphases omitted).

All of the findings indicate actions that occurred while Hoefer was employed by [Global] and were allegedly perpetrated by Ding, Douglas, and Fang, all employees of [Global]. The statements were made regarding Hoefer's performance as related to his employment with [Global]. Therefore, the allegations in the Hoefer Litigation fall squarely within that category of actions. The trial court did not err when it granted summary judgment in favor of [Cincinnati] in this matter.

# Conclusion

Global's involuntary intervention in the Hoefer Litigation was not a "suit" as defined by the insurance contract between Cincinnati and Global. Additionally, the ERP Exclusion precluded coverage by Cincinnati for Douglas, Ding, and Fang. Accordingly, the trial court did not err when it granted summary judgment in favor of Cincinnati, and we affirm.

Affirmed.

Mathias, J., and Brown, J., concur.